JEFFREY D. WOHL (Cal. State Bar No. 96838)
JULIE A. WILKINSON (Cal. State Bar No. 209180)
RISHI N. SHARMA (Cal. State Bar No. 239034)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
55 Second Street, 24th Floor
San Francisco, California  94105
Telephone: (415) 856-7000
Facsimile: (415) 856-7100
jeffwohl@paulhastings.com
juliewilkinson@paulhastings.com
rishisharma@paulhastings.com

Attorneys for Defendant
Rite Aid Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRAG TIERNO, individually, and on be-half of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>RITE AID CORPORATION, and Does 1 through 25, inclusive,<br><br>Defendants. | No. C-05-02520-TEH<br><br>**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date:   July 17, 2006<br>Time:   10:00 a.m.<br>Courtroom:   12, 19th Floor<br>Judge:   Hon. Thelton E. Henderson<br><br>Complaint filed:   May 9, 2005<br>Trial date:   None set |

**TABLE OF CONTENTS**

*Page*

Table of Authorities ........................................................................................................... iii

I.      INTRODUCTION AND SUMMARY OF OPPOSITION ...................................... 1

II.     STATEMENT OF ISSUES TO BE DECIDED ..................................................... 3

III.    STATEMENT OF FACTS ..................................................................................... 3

        A.      Overview of Rite Aid and Its Close to 600 Stores in California ...................... 3

        B.      Store Managers Are Trained to Manage All Aspects of Each Store's Operations,
                and Do So in Different Ways ........................................................................... 3

        C.      Rite Aid Makes Efforts to Ensure That Store Managers Are Properly Classified by
                Consistently Communicating Its Managerial Expectations and Monitoring Com-
                pliance Through a Self-Audit Program ............................................................ 6

                1.      Rite Aid Consistently Communicates Its Expectations That Store Manag-
                        ers Spend Substantially More Than Half of Their Time on Managerial Du-
                        ties .......................................................................................................... 6

                2.      Rite Aid's Self-Audit Program Allows Store Managers Themselves to Re-
                        port How They Are Spending Their Time .............................................. 7

        D.      The Evidence Shows That Store Managers Overwhelmingly Meet Rite Aid's
                Managerial Expectations ................................................................................. 7

                1.      Two Annual Self-Audits Show That The Vast Majority of Store Managers
                        Are Meeting Rite Aid's Managerial Expectations in Different Ways .................. 7

                2.      An Observational Study Conducted by an Outside Consultant Confirms
                        That Store Managers Meet Rite Aid's Managerial Expectations While
                        Displaying Considerable Differences in How They Perform Their Jobs ............. 8

                3.      Declarations from Current and Former (Testifying Against Interest) Store
                        Managers, as Well as A District Manager and Regional Vice President,
                        Further Underscore That Store Manager Work Patterns Are Not Uniform .......... 8

IV.     CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFF HAS
        FAILED TO MEET HIS HEAVY BURDEN OF SATISFYING THE RULE 23 RE-
        QUIREMENTS ...................................................................................................... 9

        A.      Plaintiff Has Not Shown—and, in the Face of Rite Aid's Overwhelming Evi-
                dence, Cannot Show—That There Is a Predominance of Common Issues of Fact
                or Law ............................................................................................................ 11

                1.      Rite Aid's Evidence Shows That Determining Whether a Rite Aid Store
                        Manager Spends More Than Half of His or Her Time on Exempt Job Du-
                        ties Is an Individualized Inquiry .......................................................... 11

**TABLE OF CONTENTS**
(*cont'd*)

*Page*

      2.     Faced With Evidence Similar to Rite Aid's Proof, a Number of Post-*Sav-On* Courts Have Denied Class Certification in Managerial Misclassification Cases .................................................................................................. 12

      3.     Plaintiff's Claim That How Individual Store Managers Spend Their Time Is Irrelevant at the Class Certification Stage Simply Ignores the Requirement That There Be a Predominance of Common Issues ................................... 16

      4.     Plaintiff's Argument That Rite Aid's Standardized Processes Necessarily Render Store Managers Non-Exempt Has Been Repeatedly Rejected by the Courts and Should Be Rejected Again Here ................................... 17

  B.   A Class Action Would Not Be Superior to—and, in Fact, Would Be Demonstrably Inferior to—Other Available Procedures for Resolving the Claims Presented Here ..................................................................................................................... 19

  C.   If a Class Were Certified, Trial Would Be Unmanageable ............................................. 20

  D.   Plaintiff Also Fails to Meet the Rule 23(a) Requirements ................................................ 22

      1.     Plaintiff's Claims Are Not Typical of The Class ............................................. 22

      2.     Plaintiff Is an Inadequate Class Representative ................................................. 23

V.     CONCLUSION .......................................................................................................................... 25

APPENDICES

  A     LECG Observational Study: Percent of Time Spent on All Managerial Tasks (Fortenbaugh Decl., Exh. B-1)

  B     LECG Observational Study: Percent Breakdown by Work Category (Fortenbaugh Decl., Exh. B-2)

  C     Rite Aid February 2005 Self-Audits: Percent of Time Spent on All Managerial Duties (Fortenbaugh Decl., Exh. C-1)

  D     Rite Aid June 2006 Self-Audits: Percent of Time Spent on All Managerial Duties (Fortenbaugh Dec., Exh. D-1)

# TABLE OF AUTHORITIES

*Page*

**Cases**

*In re Allstate,*
400 F.3d 505 (7th Cir. 2005) ................................................................................................... 22

*Amchem Products* v. *Windsor,*
521 U.S. 591 (1997) ..................................................................................................... 9, 10

*Armour* v. *City of Anniston,*
89 F.R.D. 331 (N.D. Ala. 1980) .............................................................................................. 23

*Baldwin* v. *Trailer Inns, Inc.,*
266 F.3d 1104 (9th Cir. 2001) ............................................................................................... 18

*Barefield* v. *Chevron, U.S.A., Inc.,*
1988 WL 188433 (N.D. Cal. 1988) ....................................................................................... 10

*Barnes* v. *America Tobacco Co.,*
161 F.3d 127 (3d Cir. 1998) ................................................................................................... 20

*In re Bendectin Products Liability Litigation,*
102 F.R.D. 239 (S.D. Ohio 1984) .......................................................................................... 10

*Blackie* v. *Barrack,*
524 F.2d 891 (9th Cir. 1975) ................................................................................................. 17

*Broussard* v. *Meineke Discount Muffler Shops, Inc.,*
155 F.3d 331 (4th Cir. 1998) ................................................................................................. 20

*Brown* v. *Regents of the Univ. of California,*
151 Cal. App. 3d 982 (1984) ................................................................................................. 21

*Caliber Bodyworks, Inc.* v. *Superior Court,*
134 Cal. App. 4th 365 (2005) ................................................................................................ 10

*Califano* v. *Yamasaki,*
442 U.S. 682 (1979) ................................................................................................................. 9

*City of San Jose* v. *Superior Court,*
12 Cal. 3d 447 (1974) ............................................................................................................ 21

*In re Dalkon Shield,*
526 F. Supp. 887 (N.D. Cal. 1981), *vacated* 693 F.2d 847 (9th Cir. 1982) ......................... 10

*In re Dalkon Shield,*
693 F.2d 847 (9th Cir. 1982) ................................................................................................. 10

*Deiter* v. *Microsoft Corp.,*
436 F.3d 461 (4th Cir. 2006) ................................................................................................. 22

1

## TABLE OF AUTHORITIES
### *(cont'd)*

2

*Page*

3

*Donovan* v. *Burger King Corp.*,
  672 F.2d 221 (1st Cir. 1982) ..................................................................... 18

4

*Donovan* v. *Burger King Corp.*,
  675 F.2d 516 (2d Cir. 1982) ...................................................................... 18

5

6

*Dunbar* v. *Albertson's, Inc.*,
  Alameda Superior No. RG04-146362 (June 28, 2005) ...................... 15, 19

7

*In re the Exxon Valdez*,
  1994 WL. 182856 (D. Alaska, Mar. 8, 1994) ........................................... 10

8

9

*In re First Commodity Corp.*,
  119 F.R.D. 301 (D. Mass. 1987) ............................................................... 10

10

*Folding Cartons, Inc.* v. *American Can Co.*,
  79 F.R.D. 698 (N.D. Ill. 1978) ................................................................. 23

11

12

*General Telegraph Co. of the Southwest* v. *Falcon*,
  457 U.S. 147 (1982) ........................................................................... 16, 23

13

*Haley* v. *Medtronic, Inc.*,
  169 F.R.D. 643 (N.D. Cal. 1996) ............................................................. 19

14

15

*In re Home Depot Overtime Cases*,
  Riverside Superior No. JCCP4229 (Feb. 2, 2006) ................... 15, 16, 19, 20

16

*Horne* v. *Crown Central Petroleum, Inc.*,
  775 F. Supp. 189 (D.S.C. 1991) ............................................................... 18

17

18

*Johnson* v. *Ford Motor Co.*,
  35 Cal. 4th 1191 (2005) ........................................................................... 21

19

*Kaplan* v. *Pomerantz*,
  132 F.R.D. 504 (N.D. Ill. 1990) ............................................................... 25

20

21

*Kirkpatrick* v. *J.C. Bradford & Co.*,
  827 F.2d 718 (11th Cir. 1987) ................................................................. 23

22

*Kline* v. *Wolf*,
  702 F.2d 400 (2nd Cir. 1983) ................................................................... 23

23

24

*Lyles* v. *K-Mart Corp.*,
  519 F. Supp. 756 (M.D. Fla. 1981) ........................................................... 22

25

*Mathews* v. *Book-of-the-Month Club, Inc.*,
  62 F.R.D. 479 (N.D. Cal. 1974) ............................................................... 20

26

27

*Moore* v. *Tractor Supply Co.*,
  352 F. Supp. 2d 1268 (S.D. Fla. 2004) ..................................................... 18

28

# TABLE OF AUTHORITIES
### (cont'd)

Page

*Murphy* v. *Kenneth Cole Productions*,
No. S140308 (Cal. S. Ct.) (review pending) ............................................................... 10

*Murray* v. *Stuckey's Inc.*,
939 F.2d 614 (8th Cir. 1991) ....................................................................................... 18

*Nordquist* v. *McGraw-Hill Broad. Co.*,
32 Cal. App. 4th 555 (1995) .................................................................................. 10, 11

*Poulos* v. *Caesars World, Inc.*,
379 F.3d 654 (9th Cir. 2004) ...................................................................................... 19

*In re Proxima*,
1994 WL 374306 (S.D. Cal. May 3, 1994) ................................................................. 23

*Ramirez v. Yosemite Water Co.*,
20 Cal. 4th 785 (1999) ...................................................................... 11, 14, 15, 17

*Russell* v. *Mini Mart, Inc.*,
711 F. Supp. 556 (D. Mont. 1988) .............................................................................. 18

*Sav-on Drug Stores, Inc.* v. *Superior Court*,
34 Cal. 4th 319 (2004) .................................................................... 12, 13, 15, 21

*Savino* v. *Computer Credit, Inc.*,
164 F.3d 81 (2nd Cir. 1998) ....................................................................................... 23

*In re School Asbestos Litigation*,
104 F.R.D. 422 (E.D. Pa. 1984), *vacated* 789 F.2d 996 (3d Cir. 1986) ...................... 10

*Sepulveda et al.* v. *Wal-Mart Stores, Inc.*,
U.S.D.C., C.D. Cal. No. CV-04-1003 DSF (May 5, 2006) ...................... 13, 14, 15, 21

*Sprague* v. *General Motors Corp.*,
133 F.3d 388 (6th Cir. 1998) ...................................................................................... 22

*In re St. Jude Medical, Inc.*,
425 F.3d 1116 (8th Cir. 2005) .................................................................................... 20

*Staton* v. *Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) ............................................................................... 17, 20

*Valentino* v. *Carter-Wallace, Inc.*,
97 F.3d 1227 (9th Cir. 1996) ...................................................................................... 10

*Valles* v. *Ivy Hill Corp.*,
410 F.3d 1071 (9th Cir. 2005) .................................................................................... 10

*Wang* v. *Chinese Daily News, Inc.*,
231 F.R.D. 602 (C.D. Cal. 2005) ............................................................................... 15

1

**TABLE OF AUTHORITIES**
*(cont'd)*

2
Page

3
*Zinser* v. *Accufix Research Institute, Inc.*,
    253 F.3d 1180, *amended* 273 F.3d 1266 (9th Cir. 2001).................................................... 9, 11, 19

4

**Statutes, Rules, and Wage Orders**

5

California Industrial Welfare Commission Wage Order 7-2001
6      § 1(A)(1)(e)................................................................................................................. 11
       § 1(A)(2)(f) ................................................................................................................. 11
7
Cal. Lab. Code
8      § 98(a) ........................................................................................................................ 20
       § 98.2(a) ..................................................................................................................... 20
9      § 98.4 ......................................................................................................................... 20
       § 203 .......................................................................................................................... 10
10     § 218.5 ....................................................................................................................... 20
       § 226.7 ....................................................................................................................... 10
11     § 515(a) ...................................................................................................................... 11
       § 558 .......................................................................................................................... 10
12
Fed. R. Civ. Proc.
13     R. 23 ............................................................................................................................. 9
       R. 23(a) ...................................................................................................................... 22
14     R. 23(a)(3)........................................................................................................ 10, 22, 23
       R. 23(a)(4)........................................................................................................... 10, 23
15     R. 23(b) ...................................................................................................................... 20
       R. 23(b)(1) .................................................................................................................. 10
16     R. 23(b)(2) .................................................................................................................. 10
       R. 23(b)(3)....................................................................................................... 2, 10, 19
17     R. 23(b)(3)(D) ............................................................................................................ 19

18

19

20

21

22

23

24

25

26

27

28

-vi-                    MEMO. IN OPPTN. TO CLASS CERT.
                                                           U.S.D.C., N.D. Cal., No. C-05-02520-TEH

## I.   INTRODUCTION AND SUMMARY OF OPPOSITION

Defendant Rite Aid Corporation ("Rite Aid") operates close to 600 drug stores in California. Rite Aid stores come in different shapes, sizes, and complexities. While a few are small, most are substantial, with store sizes between 14,000 and 26,000 square feet, 16 to 29 employees, and $4.4 million to $9.2 million in annual sales. Still others are extremely large, with 61,000 in square feet, 65+ employees, and $23.5 million in annual sales. Some offer a full range of products and services, including general nutrition products, garden supplies, nursery, one-hour photo processing, and an ice cream counter; others do not. Some are open 24 hours a day; others have limited store hours.

Regardless of size, workforce, sales volume, or product or service line, at each Rite Aid store the top person in charge is the Store Manager, the only exempt employee in each store. The Store Manager is principally responsible for all aspects of the operation of his or her store, including, among other things, employee hiring, training, assignment, scheduling, supervision, coaching, evaluation, discipline, and termination; budgeting; payroll; product placement; store security; and resolution of customer-complaint escalations. Day in and day out, the Store Manager must exercise independent judgment and discretion over a wide variety of store issues. The Store Manager bears ultimate responsibility for the operations, profitability, security, and orderly functioning of the store.

On this motion, plaintiff Prag Tierno, a thoroughly discredited witness who was fired by Rite Aid as a Store Manager for making fraudulent sales, seeks to certify a class of all current and former Store Managers since May 2001 on the claim that they should have been classified as non-exempt under California overtime laws. Plaintiff contends that the job of Store Manager is exactly the same from store to store and is filled mostly with non-exempt job duties. On both counts, nothing could be further from the truth. The evidence, in contrast to plaintiff's sweeping and unsupported allegations, shows that a clear majority of Rite Aid Store Managers spend most of their time on managerial duties and that, in any event, there is so much variation in the work duties they perform and how they spend their time that a determination of their exempt status can be made only on an individualized, and not a classwide, basis.

Plaintiff's motion is premised upon the unfounded and absurd proposition that the core issue of a manager's exempt classification under California law—whether the employee spends more than half the time on exempt duties—is irrelevant to class certification. According to plaintiff, based on little more

than the fact that Rite Aid has standardized policies and procedures, the Court should decide each Store Manager's exempt/non-exempt classification on a classwide basis.

To be sure, a motion for class certification is not the time for the Court to decide the merits of plaintiff's claim that Store Managers should be classified as non-exempt.  But the evidence here shows that when it comes to Rite Aid Store Managers, California's 50%-plus test for exempt classification can only be decided on an individual-by-individual basis; *i.e.*, because of the significant differences among Store Managers in how they do their jobs, their exempt status can be decided only by looking at the specific duties each performs and how each spends his or her time on an individual-by-individual basis.  As a consequence, plaintiff cannot meet his heavy burden under Federal Rule of Civil Procedure 23(b)(3) to show that there is a predominance of common issues of fact or law warranting class certification.

Since plaintiff presents no evidence that Store Managers perform the same job duties, perform them the same way, and spend the same amount of time on them, Rite Aid could have rested on plaintiff's failure to meet his burden of proof in urging the Court to deny his motion.  But Rite Aid goes much further.  In this opposition, Rite Aid presents overwhelming evidence that Store Managers spend most of their time on exempt job duties and that there is substantial variation in what job duties they perform and the time they spend on those duties.  Rite Aid's compelling proof, detailed in section III below, includes:

- 1,014 individual self-audits—completed by Store Managers in the regular course of business over two years—attesting to the overwhelmingly managerial nature of their jobs and how they divergently spend their work time.  In these self-audits, 82.4% (in 2005) and 86% (in 2006) of Store Managers reported spending more than half of their time on managerial duties.  These self-audits are backed by 82 declarations by Store Managers attesting to the veracity of their responses.  In declarations signed by Store Managers who initially reported spending less than 50% of their time on managerial duties, the Store Managers report that they have since restored the proper balance of their work time.

- An observational study, conducted by a third-party consulting firm, that also corroborates the results of the self-audits.

- Several detailed declarations from current and former (testifying against interest) Store Managers setting forth the nature of managerial duties that Store Managers perform, and

1    that they do/did, in fact, spend most of their time on exempt job duties.

2    ▪    Detailed declarations from Rite Aid executives further confirming the heavily managerial

3    but varied nature of the Store Manager job.

4    The collective import of this mass of evidence is unmistakable and dispositive: *Store Managers*

5    *not only spend most of their time on managerial functions, they perform their jobs differently from one*

6    *another*.  Whether a given Store Manager spends more than 50% of his or her time performing exempt

7    duties thus is an individual question, not susceptible of common proof.  This predominance of individual

8    issues precludes class certification.

9    **II.    STATEMENT OF ISSUES TO BE DECIDED**

10    Whether a class may be properly certified given plaintiff's failure to show a predominance of

11    common issues; the lack of typicality of his claims; and his inadequacy as a class representative.

12    **III.    STATEMENT OF FACTS**

13    **A.    Overview of Rite Aid and Its Close to 600 Stores in California.**

14    Rite Aid is a national drugstore chain with about 590 stores in California.  RSE 1.[1]  Each Cali-

15    fornia Rite Aid store is unique in many ways, including size, store configuration, workforce, and sales

16    volume.  RSE 2.  Most of the stores are substantial, with annual revenues in the millions (some as much

17    as $23.5 million or more), tens of thousands of square feet, and large workforces (some that exceed 65

18    employees).  RSE 3, 5-6.  Rite Aid stores occupy a variety of geographic locations.  RSE 4.  Some Rite

19    Aid stores offer special products and services, such as General Nutrition Centers ("GNC"), garden sup-

20    plies, nursery, one-hour photo processing, and an ice cream counter.  Several locations are open 24

21    hours a day, while others have more limited store hours.  RSE 7.

22    **B.    Store Managers Are Trained to Manage All Aspects of Each Store's Operations, and Do So in Different Ways.**

23

24    Store Managers are the top of the management hierarchy in each Rite Aid store—there is only

25    one Store Manager per store and every other front-end (non-pharmacy) employee who works in the

26    store—including assistant managers and shift supervisors (non-exempt employees who assist the Store

27

---

[1]    Citations are to Rite Aid's Summary of Evidence in Opposition to Class Certification ("RSE"),
28    filed with this opposition, which contains all record citations.

Manager)—reports directly to the Store Manager.  RSE 9.  The majority of Rite Aid stores also have pharmacies.  The pharmacy employees are directly supervised by the Pharmacy Manager in each store, but the pharmacy employees—including the Pharmacy Manager—indirectly report to the Store Manager.  *Id*.  Store Managers thus either directly or indirectly supervise every hourly employee within the store, and thus can directly or indirectly manage several dozen employees.  RSE 9-10.  Commensurate with their considerable responsibilities, Store Managers are the only exempt employees in their store, RSE 9, and they earn an average of approximately $52,500 annually, with bonus eligibility.  RSE 11-12.

A Store Manager's principal duties and responsibilities require the exercise of independent judgment and discretion.  The Store Manager oversees the entire store and directs all store operations.  A Store Manager's duties include: interviewing and hiring employees; promoting employees; evaluating job performance (including giving job coaching and training, as well as formal written reviews); adjudging misconduct and calibrating appropriate discipline; participating in terminating employees; directly supervising all front-end employees and indirectly supervising all pharmacy employees; managing and controlling store profit and loss, including but not limited to cash handling and practices, payroll, inventory levels, shrink, maintenance, and other operational needs as required; handling personnel and customer issues as they arise; prioritizing and delegating tasks; managing daily workforce levels; making judgment calls regarding how merchandise should be displayed or moved from the backroom; and directing hourly staff to accomplish objectives.  RSE 13.

Indeed, notwithstanding his allegations in this case, plaintiff himself admitted in deposition the primacy of his managerial responsibilities at Rite Aid (*see* RSE 53):

> Q.   "What was your idea [of the role the store manager was supposed to play in the store]?"
> A.   "To manage the everyday operations."
> Q.   "Okay.  And to manage the everyday operations meant to act as a leader, correct?"
> A.   "Yes."  (Tierno Depo., 83:21-25.)
>
> Q.   "Scheduling your associates.  Deciding who was going to work what.  Was that your job?"
> A.   "Yes."
> Q.   "How about doing payroll?  Wasn't that your job?"
> A.   "Yes."
> Q.   "How about reviewing store sales volume and goals?"
> A.   "Yes."
> Q.   "How about walking the floor to see how things were going?"

-4-

A.   "Yes."
Q.   "And planning and distributing work duties?"
A.   "Yes."
Q.   "Coaching associates?"
A.   "Yes." …
Q.   "Overseeing display setups?"
A.   "Yes." …
Q.   "Disciplining employees if there was a problem?"
A.   "Yes."
Q.   "Terminating them if there was a problem?"
A.   "Yes." …
Q.   "So how is it that you determined whether you should do [certain tasks] yourself, personally, rather than having an associate do it?"
A.   "By prioritize [*sic*]."  (Tierno Depo., 88:7-89:11.)

Q.   "[Reading from plaintiff's self-assessment] 'What do you consider to be the five most important functions of your job:  One, exceed my customer service expectations; two, respect, develop, and appraise my associates and coworkers; three, successfully consistently manage, control, operate company resources; four, identify opportunities; five, deliver to my supervisors and company owners/shareholders the highest return.'  Are those all true statements as to what you considered at the time to be your five most important functions of the job?"
A.   "Yes." …
Q.   "[I]sn't it true that while you were a store manager at Santa Fe, you spent most of your time focused on delivering on those five functions that you just listed there?"
A.   "Yes." (Tierno Depo., 142:15-143:14, Exh. 4.)

Before starting in a Rite Aid management position, each Store Manager is expected to complete Rite Aid's Management Development Program ("MDP"), an approximately eight- to ten-week, full-time management-training program focusing on leadership skills.  RSE 15.  During the MDP training, participants spend one to two days per week in classroom training and two to four days per week in in-store training.  RSE 16.  During the classroom portion, MDP attendees complete training modules on various topics, including: merchandising and marketing, store financials, inventory management, security management, store operations and administrative management, pharmacy operations, loss prevention, human resources, excellence in management, leadership and training, diversity, and Rite Aid policies and procedures.  RSE 17.  In addition, MDP participants are specifically instructed that Rite Aid expects them to spend the majority of their time on managerial duties.  RSE 18.  The in-store portion of the MDP provides hands-on training on all facets of Rite Aid retail operations, including implementation of the modules taught in the classroom portion of the MDP, as well as further training regarding company systems, programs, resource tools, policies and procedures, communications, methodologies, leadership, financials, operations, marketing, finance, and logistics, and specifics such as directing hourly staff in mer-

chandising, providing customer service, processing inventory, coaching and discipline. RSE 19.

The Store Manager job differs from one Store Manager to the next. Which particular duties a Store Manager performs, and how he or she performs them, is for the Store Manager to determine day by day; the duties differ by individual and vary widely based on factors such as store location, store volume, size, store configuration, staffing levels, staff competency/performance, hours of operation, merchandise selection, services offered, seasonal changes, and the managerial choices and style and experience of the Store Manager. RSE 14. For example, as shown by testimony drawn from the declaration of a Rite Aid Regional Vice President:

> [A] Store Manager in a store with a higher sales volume must be able to plan and organize for a faster-paced business; this usually means that the Store Manager will have a greater number of associates, and it requires that the Store Manager spend more time planning and ensuring that the store is properly staffed to meet customer needs (which vary depending upon day of the week and time of the day), that the Store Manager ensures that a sufficient number of associates are assigned to functions such as resetting and restocking merchandise, and ensuring that associates are trained to do the same. In contrast, a Store Manager at a lower sales volume store will generally have fewer associates, and therefore must spend more time prioritizing which tasks need to be accomplished and when, and spend more time ensuring that the store's associates are able to multi-task. Additionally, a Store Manager in a store in an urban environment faces challenges different than their counterparts in suburban stores. For example, a Store Manager in an urban store needs to delegate more time and attention to security issues; there is often a greater turnover of associates (and a lesser qualified pool of applicants) and therefore the Store Manager needs to spend more time on interviewing, hiring and training; urban stores tend to have a faster-paced environment with smaller dollar value purchases; there are often cultural and language variations in the customer population that the Store Manager needs to be aware of, which will effect both store inventory (types and quantities of products carried) and appropriate employee training to reflect those varying client needs. [*Id.* (Toney Decl., ¶¶ 7, 8).]

**C.    Rite Aid Makes Efforts to Ensure That Store Managers Are Properly Classified by Consistently Communicating Its Managerial Expectations and Monitoring Compliance Through a Self-Audit Program.**

**1.    Rite Aid Consistently Communicates Its Expectations That Store Managers Spend Substantially More Than Half of Their Time on Managerial Duties.**

To reinforce their MDP training that they are expected to be leaders and to spend more than half of their time performing managerial tasks, once Store Managers start at their stores they continuously are reminded of this expectation by their District Managers. RSE 20. Rite Aid further reiterates its managerial expectations through the annual performance review process, during which Store Managers complete self-assessments to identify their principal objectives over the review period and report on

whether they accomplished them.  The Store Managers are evaluated on such leadership dimensions as planning skills, organizing skills, controlling skills, communication, leadership, creativity and imagination, analytical ability, associate management and development, and hiring and promotion practices. RSE 21.  Those who do not meet these management expectations are required to improve.  RSE 22.

> **2.** **Rite Aid's Self-Audit Program Allows Store Managers Themselves to Report How They Are Spending Their Time.**

In February 2005, Rite Aid commenced a series of annual self-audits to determine whether California Store Managers in fact spend more than 50% of their time on managerial duties.  RSE 23-25. Through the self-audits, Rite Aid is able to identify Store Managers who report spending 50% or less of their time on exempt functions, to follow up with those Store Managers to correct their work balances, and, failing that, to reclassify them as non-exempt employees without any diminution in pay.  RSE 26.

Rite Aid's self-audit program was designed to elicit accurate self-reporting of how Store Managers spend their work time.  The self-audit form lists eight categories of management tasks and eight categories of non-management tasks, and asks each Store Manager to report the average percentage of work time spent on each task, with total percentages adding up to 100%.  RSE 27.  The self-audit makes clear that complete honesty is expected, and that no retaliation (or reward) will result from a Store Manager's answers.[2]  Each Store Manager also signs the self-audit, certifying that the answers given are true.  RSE 32.  With this opposition, by way of example, Rite Aid submits 82 Store Manager declarations re-verifying the accuracy of their self-audits.  RSE 33-34.  Where the Store Manager/declarant had initially reported spending 50% or less of his time on managerial duties, he reports that he subsequently restored the proper balance of his work duties.  RSE 37.

> **D.** **The Evidence Shows That Store Managers Overwhelmingly Meet Rite Aid's Managerial Expectations.**

> **1.** **Two Annual Self-Audits Show That The Vast Majority of Store Managers Are Meeting Rite Aid's Managerial Expectations in Different Ways.**

Two self-audits have been conducted to date, in February 2005 and June 2006.  RSE 25.  The re-

---

[2]     "Using this self-audit form, analyze and report how you spend your work time.  <u>Please</u> <u>be</u> <u>candid</u>.…All we want are your honest responses…. [N]o adverse action will be taken against you regardless of how you respond.  Similarly, you will not receive any reward or benefit based on how you answer." RSE 29-31 (Exh. B to Sapp Decl.) (emphasis in original).

sults are resounding: 82.4% (in 2005) and 86% (in 2006) of Store Managers reported spending a major-

ity of their time managing, not performing hourly tasks.  RSE 35-36.  The self-audits also reveal wide

differences in how Store Managers spend their time.  For example, some Store Managers report spend-

ing just over 50% of their time on managerial duties, while others report spending close to 100% of their

time managing.  RSE 39.  The self-audits show that virtually no two Store Managers spend their time in

the same fashion.  Indeed, there were no matches of time allocation in the 2005 audits, and only three

instances of two Store Managers reporting the same time allocation in the 2006 audits.  RSE 40.

> **2.     An Observational Study Conducted by an Outside Consultant Confirms That Store Managers Meet Rite Aid's Managerial Expectations While Displaying Considerable Differences in How They Perform Their Jobs.**

As part of Rite Aid's defense in this case, the LECG consulting firm conducted shadowing ob-

servations of California Rite Aid Store Managers during a work week.  RSE 41-42.  LECG consultants

followed 12 randomly-chosen Store Managers for a full week of work and recorded what the Store

Managers did throughout the entirety of their workday.  *Id.*  Almost all of the Store Managers observed

(11 of 12) spent most of their time on exempt functions, with the percentages varying significantly.

RSE 43.  Moreover, the study showed significant variations in the tasks they performed and the time

they spent on those tasks.  *Id.*[3]

> **3.     Declarations from Current and Former (Testifying Against Interest) Store Managers, as Well as A District Manager and Regional Vice President, Further Underscore That Store Manager Work Patterns Are Not Uniform.**

Rite Aid submits numerous declarations from current Store Managers demonstrating that not

only do Store Managers spend the majority of their time performing managerial functions, but also each

performs his or her job in a unique manner, depending on numerous factors, including which tasks are

performed, store size, sales volume, staffing levels and staff competency, customer base, and store or-

ganization.  RSE 44.  Rite Aid also offers declarations from former Store Managers who have no current

connection to Rite Aid and, if anything, have a strong financial incentive to testify in favor of class certi-

fication.  Yet, they, too, confirm the managerial and individualized nature of the Store Manager job.

---

[3]     Graphics showing the wide variations in Store Manager work patterns revealed by the self-audits and the LECG observational study are exhibits to the Fortenbaugh Declaration (*see* RSE 39-40, 43); a few are appended to this memorandum.

1    RSE 45.  As one Store Manager testifies:

2        There are several factors that will lead Store Managers to perform their jobs differently.
         For example, higher volume stores will impose different demands on a Store Manager's
3        time than lower volume stores.  Differences in payroll budget also will change how a Store
         Manager performs his job.  Sometimes stores with the same volume will have different
4        payroll budgets.  Yet, both stores are tasked with achieving the same goal of increasing
         sales.  The larger your staff, the easier it is to delegate tasks [] that need to be completed to
5        others instead of trying to accomplish them yourself.  In addition, the experience of the
         Store Manager and his staff will make a difference.  More experienced Store Managers
6        will know that delegating tasks instead of trying to do them yourself is a much more effec-
         tive means of running a store.  Newer Store Managers may not know how and what to ef-
7        fectively delegate.  Similarly, newer employees will require more guidance and training
         than more seasoned employees who can be trusted to accomplish their tasks without much
8        supervision.  [RSE 14 (Hindman Decl., ¶ 11); *see also* RSE 44, 47.]

9    **IV.   CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFF HAS FAILED
            TO MEET HIS HEAVY BURDEN OF SATISFYING THE RULE 23 REQUIREMENTS**
10

11        To win class certification, plaintiff must satisfy the rigorous requirements under Rule 23, Federal

12   Rules of Civil Procedure.  "Rule 23(a) states four threshold requirements applicable to all class actions:

13   (1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality

14   ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are

15   typical...of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately

16   protect the interests of the class').  In addition to satisfying Rule 23(a)'s prerequisites, parties seeking

17   class certification must show that the action is maintainable under Rule 23(b)(1) [incompatible standards

18   of conduct or impairment of interests], (2) [primarily injunctive relief sought], or (3) [predominance of

19   common issues of fact or law]."  *Amchem Prods.* v. *Windsor*, 521 U.S. 591, 613-14 (1997).

20        The class-action device was designed as "an *exception* to the usual rule that litigation is con-

21   ducted by and on behalf of the individual named parties only."  *Califano* v. *Yamasaki*, 442 U.S. 682,

22   700-701 (1979) (emphasis added).  As a result, the plaintiff bears the heavy burden of establishing each

23   required element for class certification.  *Zinser* v. *Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186,

24   *amended*, 273 F.3d 1266 (9th Cir. 2001) ("[T]he party seeking class certification…bears the burden of

25   demonstrating that she has met each of the four requirements of Rule 23(a) and at least one of the re-

26   quirements of Rule 23(b)….Before certifying a class, the trial court must conduct a 'rigorous analysis'

27   to determine whether the party seeking certification has met the prerequisites of Rule 23.").  Only suit-

28   able for the class action device are those cases where homogeneity among the class members is such that

the few can fairly and adequately stand for the many, and where the device is the most effective and efficient procedural tool. *Amchem Prods.*, 521 U.S. at 613; *see also Valentino* v. *Carter-Wallace, Inc.*, 97 F.3d 1227, 1233 (9th Cir. 1996) (to certify class, court must conduct "rigorous analysis" that Rule 23 requirements are met).

Although plaintiff purports that a class could be certified under Rule 23(b)(1) (incompatible standards of conduct or impairment of interests) or 23(b)(2) (primarily injunctive relief sought), in fact neither is applicable here; and in so arguing, plaintiff repeatedly cites cases that have been reversed and misstates the holdings of other cases.[4] In addition, plaintiff has failed to meet his burden with respect to Rule 23(b)(3) (predominance of common issues of fact or law) and 23(a)(3) and (4) (typicality and adequacy of representation).

---

[4]     Rule 23(b)(1) does not apply because, absent class treatment, no adjudication for or against a particular Store Manager's exempt classification would bind Rite Aid, or another Store Manager, on the same issue. *See Nordquist* v. *McGraw-Hill Broad. Co.*, 32 Cal. App. 4th 555 (1995) (adjudication of exempt status of one employee had no binding effect on exempt status of another employee holding same job). Rule 23(b)(2) is equally inapplicable because plaintiff's primary claim is for money damages—the alleged unpaid overtime for past hours worked—not injunctive relief. Indeed, half of the putative class members here are former Store Managers who by definition would not benefit from any injunctive relief against Rite Aid. RSE 8. Plaintiff's argument that under Rule (b)(1) or (b)(2) a class may be certified because plaintiff seeks punitive damages is fanciful. California law provides penalties for violation of the overtime laws. *See* Cal. Lab. Code §§ 203, 558. Although the issue is before the California Supreme Court in *Murphy* v. *Kenneth Cole Productions*, No. S140308 (review pending), the one-hour payments for denied meal and rest period laws, *see* Cal. Lab. Code § 226.7, should be deemed penalties, not wages. *See Valles* v. *Ivy Hill Corp.*, 410 F.3d 1071 (9th Cir. 2005) (*dictum*); *Caliber Bodyworks, Inc.* v. *Superior Court*, 134 Cal. App. 4th 365, 376 (2005) (*dictum*). Needless to say, punitive damages should not be available where a penalty is already provided by statute. Furthermore, a class cannot be certified based upon the mere possibility of punitive damages. Punitive damages must either: (1) be pendent to a case, which is certifiable on another, independent basis (*e.g.*, *Barefield* v. *Chevron, U.S.A., Inc.*, 1988 WL 188433 (N.D. Cal. 1988) (Henderson, J.); or (2) create a substantial likelihood of bankruptcy, through some exceptional facts (*e.g.*, *In re Dalkon Shield*, 693 F.2d 847 (9th Cir. 1982)). Because neither of these factors is present here, certification cannot be premised upon the possible existence of punitive damages. To hold otherwise would eviscerate Rule 23(b) of any meaning outside the contract realm, as any case could be certified based upon merely meeting the Rule 23(a) requirements and including a claim for punitive damages. The courts cannot lessen these requirements; rather, they must steadfastly employ the criteria of the Federal Rules. *Amchem Prods.*, 521 U.S. at 613-14. Finally, plaintiff plays fast and loose with the Court by citing cases that (a) certified a punitive damages class when those rulings were subsequently vacated on appeal, *see, e.g.*, *In re Dalkon Shield*, 526 F. Supp. 887 (N.D. Cal. 1981) (class certification *vacated* at 693 F.2d 847 (9th Cir. 1982)); *In re School Asbestos Litigation*, 104 F.R.D. 422 (E.D. Pa. 1984) (class certification as to punitive damages *vacated* at 789 F.2d 996 (3d Cir. 1986)); (b) do not stand for the proposition stated because they say *nothing* about punitive damages, *see In re the Exxon Valdez*, 1994 WL 182856 (D. Alaska, Mar. 8, 1994); *In re Bendectin Products Liability Litigation*, 102 F.R.D. 239 (S.D. Ohio 1984); or (c) do not follow Ninth Circuit precedent, *see In re First Commodity Corp.*, 119 F.R.D. 301, 312 n.20 (D. Mass. 1987) (expressly departing from Ninth Circuit's rule in *Dalkon Shield*).

A.    **Plaintiff Has Not Shown—and, in the Face of Rite Aid's Overwhelming Evidence, Cannot Show—That There Is a Predominance of Common Issues of Fact or Law.**

"Certainly, there may be common issues in this case….[B]ut to determine causation and damages…it is inescapable that many triable individualized issues may be presented." *Zinser*, 253 F.3d at 1189 (affirming dismissal based upon lack of predominance).   That is the case here.

1.    **Rite Aid's Evidence Shows That Determining Whether a Rite Aid Store Manager Spends More Than Half of His or Her Time on Exempt Job Duties Is an Individualized Inquiry.**

Under California law, in order to be exempt from overtime compensation, a manager must spend more than 50% of working time performing exempt duties. *See* Cal. Labor Code § 515(a); IWC Wage Order 7-2001, §§ 1(A)(1)(e), 1(A)(2)(f); *see also Ramirez* v. *Yosemite Water Co.*, 20 Cal. 4th 785, 797 (1999) ("[Determining exempt status is] purely quantitative...focusing exclusively on whether the individual 'works more than half the working time' [performing qualifying duties].").   Whether an exemption applies, therefore, depends on how the individual actually performs the job. *See* IWC Wage Order 7-2001, § 1(A)(1)(e) ("The work actually performed by the employee during the course of the work week must, first and foremost, be examined and the amount of time the employee spends on such work...shall be considered in determining whether the employee satisfies this requirement."); *Ramirez*, 20 Cal. 4th at 802 ("[T]he court should consider, first and foremost, how the employee actually spends his or her time.").   Exempt status for a particular individual does not depend on title, job description, quantity of work, or how any other person performs the job; it must be evaluated *person by person.*

*Nordquist* v. *McGraw-Hill Broad. Co.*, 32 Cal. App. 4th 555 (1995), well illustrates that because of its quantitative requirement, exempt status under California law requires an individualized determination.   In *Nordquist*, a sports director/anchor sued for overtime compensation, claiming that he had been misclassified as exempt.   In defense, the employer relied on the fact that the individual who succeeded the plaintiff in the same position had brought a similar claim and was found to be exempt. *Id.* at 568. However, the court disregarded that finding as "not dispositive here because the decision is fact specific." *Id.*   The *Nordquist* plaintiff was non-exempt based on an analysis of how he (and not anyone else, even his successor) performed the job. *Id.* at 568-73.   Thus, two different court actions, involving different employees holding exactly the same job, produced opposite results based on how particular

1    persons performed the job.

2         Here, Rite Aid has presented substantial and persuasive evidence that most Store Managers sat-

3    isfy the 50%-plus test and that, even more importantly for purposes of class certification, there are sig-

4    nificant variations in how particular Store Managers perform their jobs, both in terms of what duties

5    they perform, how those duties are performed, and how much time they spend on those duties.  We

6    know this, person by person, because each Store Manager contemporaneously certified his or her alloca-

7    tion of work time—82.4% (in 2005) and 86% (in 2006) reported that they spend a majority of their time

8    on exempt job duties—and in doing so we know that they perform their jobs in a variety of ways, re-

9    flecting the variety of differences in the shape, size, location, customer base, and products and services

10   of the Rite Aid stores they manage.  RSE 14, 32, 35-36, 39-40.  The self-audits expressly request hon-

11   esty and candor of their respondents, assure against retaliation, and guarantee that reclassification will

12   not result in any diminution of pay (*see* note 2 *supra*).[5]  Therefore, their findings should be afforded sig-

13   nificant weight.  The 82 Store Manager declarations further validate the self-audit responses, as does the

14   LECG study.  RSE 34-36, 43.  Also supporting the reliability of the self-audits is the fact that a number

15   of the SMs candidly reported spending 50% or less of their time on managerial duties.  *See* RSE 35-37.

16   When that happened, there was no punishment; Rite Aid instead followed up to help the Store Managers

17   restore the proper work balance.  RSE 37.

18        As illustrated by *Nordquist*, since exempt status for a particular Store Manager will not turn on

19   job title or generalizations, whether an individual meets or falls short of Rite Aid's managerial expecta-

20   tions are questions that must be answered on a Store Manager-by-Store Manager basis.

21        **2.    Faced With Evidence Similar to Rite Aid's Proof, a Number of Post-*Sav-On***
              **Courts Have Denied Class Certification in Managerial Misclassification**
22            **Cases.**

23        Plaintiff places great reliance on the California Supreme Court's decision in *Sav-on Drug Stores,*

24   *Inc.* v. *Superior Court*, 34 Cal. 4th 319 (2004).  But *Sav-on*, which obviously does not bind this Court on

25   _____
     [5]    The self-audit form instruction sheet states:  "If you are spending the majority of your time on
26   non-managerial duties, we want to understand the conditions in your store causing this and we will work
     with you to restore the proper balance of your work duties.…If our efforts are unsuccessful as restoring
27   the proper work balance, Rite Aid may reconsider your exempt classification.  If you are reclassified as
     non-exempt, your compensation would be changed from salaried to hourly at a rate that, with anticipated
28   overtime hours, *would not be expected to result in a loss of pay*."  RSE 31 (emphasis added).

whether to certify a class under Federal Rule 23, merely reaffirmed established California procedural law that the trial judge has broad discretion to make the certification determination in the first instance and that his or her determination will be reviewed under the deferential standard of abuse of discretion. *Sav-on,* 34 Cal. 4th at 324 ("The question presented is whether the trial court abused its discretion in certifying as a class action this suit...."); *accord, id.* at 326-27 (" [A] trial court ruling supported by substantial evidence generally will not be disturbed..."). Indeed, the court in *Sav-on* specifically held that the appellate court should have been equally deferential if the trial court had denied, rather than granted, class certification. *See id.* at 331.

Several subsequent class certification decisions in the retail manager context (including one from another federal district court) confirm that *Sav-on* itself does not favor class certification; rather they reflect that class certification is inappropriate where individualized issues predominate. While also not binding precedent, these decisions are instructive. In *Sepulveda* v. *Wal-Mart Stores, Inc.*, Judge Fischer of the Central District of California denied plaintiffs' motion for class certification in a case where the facts are substantially the same as presented here.[6] In *Wal-Mart*, the plaintiffs claimed they and all other Wal-Mart assistant managers ("AMs") were misclassified as exempt. Like plaintiff here, they argued that AMs had the same title and job description, performed the same duties, and were required to follow standardized policies and procedures. They further argued that the "common policy" of classifying AMs as exempt was a single policy decision appropriate for class treatment. Wal-Mart, like Rite Aid here, argued that the key issue was how each AM actually spent his or her time, and showed its stores differed by location, size, and organization, and managers spent varying amounts of time on various exempt and non-exempt duties.[7]

---

[6]    Order Denying Plaintiffs' Motion for Class Certification, *Sepulveda* et al. v. *Wal-Mart Stores, Inc.*, U.S.D.C., C.D. Cal., No. CV-04-1003 DSF (May 5, 2006).  (*Wal-Mart* and other decisions denying class certification after *Sav-on* are attached to Rite Aid's Request for Judicial Notice.)

[7]    Notably, the plaintiffs in *Wal-Mart* made the same argument as plaintiff here with regard to the fact that Wal-Mart has "many standard operating procedures, metrics, and performance targets to run its stores."  In fact, the list of "standardized" items noted in the *Wal-Mart* decision is almost identical to those cited by plaintiff here, *i.e.*, that the home office determines such items as what merchandise is sold and at what prices, how merchandise is displayed, the temperature settings and music played in the stores, signage in the stores, the home office's access to computer generated reports on each store's daily activities, and corporate-generated operations manuals, training materials and performance evaluation forms.  However, Wal-Mart submitted evidence that AMs perform a long list of tasks requiring significant amounts of judgment and discretion, which tasks can vary depending upon such factors as store

In denying plaintiffs' motion, Judge Fischer found that while plaintiffs met their initial burden in meeting the four prerequisites under Rule 23(a), they were unable to make the necessary showing under any of the prongs of Rule 23(b).  Specifically, the court found that there was no risk of inconsistent judgments under Rule 23(b)(1) "because [Wal-Mart] can simply treat some members of the AM class as exempt but not others," and an injunction ordering Wal-Mart to reclassify one AM "would not affect the rights of the other AMs."  As to Rule 23(b)(2), the court noted that it was undisputed that Wal-Mart—like Rite Aid—"classified AMs as exempt based on grounds generally applicable to AMs," however, that was not the focus of the Rule 23(b)(2) inquiry.  Rather, "the question is whether the primary relief sought is injunctive"… and the court resolved this question in the negative, noting that (i) the primary relief sought by plaintiffs' complaint was monetary, not injunctive, and (ii) "fewer than half of the putative class members could benefit from the injunctive relief sought" given the large number of former-employees in the putative class.  The court then held that

> the damages sought will require highly individualized proof of the duties each AM actually performed, the hours spent on those duties and the overtime hours actually worked. That the damages sought are not in the nature of a group remedy but are dependent on individual circumstances suggests they are not incidental to the injunctive relief sought.

Finally, with regard to Rule 23(b)(3)'s predominance inquiry, Judge Fischer found that, while certain questions may be susceptible to common proof,[8] "many highly individualized questions remain."[9]  Judge Fischer cited the two-step inquiry set forth by the California Supreme Court in *Ramirez*, 20 Cal. 4th 785—namely, that a court must first "examine, in an individualized fashion, the work actually performed by an employee to determine how much of that work is exempt," and then "determine whether the employee's work was consistent with the employer's expectations, and whether those ex-

---

size, sales volume, and workforce composition, among others.  In the end, the competing evidence on this issue was non-determinative as to Judge Fischer's ruling.

[8]    *E.g.*, which AM duties are properly classified as exempt and which are not, whether defendant has uniform policies with respect to treating AMs as exempt and governing their duties, whether defendant encourages uniformity in its stores and has uniform expectations of its AMs, and whether defendant routinely failed to pay overtime and provide meal and rest breaks to its AMs.

[9]    *E.g.*, whether each AM spent more time working on exempt versus non-exempt duties, and then for each AM found to have spent more time on non-exempt duties, the amount of overtime pay owed, the number of meal and rest breaks missed, and any expressions of dissatisfaction from Wal-Mart with the work the AM was actually performing.

pectations were realistic." Judge Fischer then found that *Wang*[10] and *Sav-On*—the same two cases principally relied upon by plaintiff here—"do not suggest that the Court should ignore the *Ramirez* standard. They merely state that the *Ramirez* inquiry is only one of many possible questions in an exemption case. In determining whether an employee should be classified as exempt or non-exempt, *an individualized, Ramirez-type inquiry must be conducted*." (Emphasis added.) Thus, on balance, the court found that "the individual questions predominate over common issues. While common legal and factual questions do exist, there are relatively few that would actually require resolution. By far the bulk of the evidence would pertain to individualized questions, including the work performed by each individual AM."

Two state court judges have ruled similarly: Alameda Superior Court Judge Sabraw in *Dunbar* v. *Albertson's, Inc.* and Riverside Superior Court Judge Webster in the *Home Depot* overtime cases.[11] In *Albertson's*, the plaintiffs claimed misclassification of Albertson's grocery managers ("GMs"), making the same general arguments as in *Wal-Mart* and the present case. In a thoughtful opinion, Judge Sabraw concluded that plaintiffs failed to demonstrate the predominance of common issues and declined to certify the class. He recognized that determination of exempt/non-exempt status "requires an inquiry into the different factual circumstances of each class member." The evidence in *Albertson's*, like the evidence here, demonstrated that the work GMs performed varied from individual to individual, as well as from week to week for each individual. Albertson's decision to classify the GMs as exempt thus might have been correct as to some but incorrect as to others. Class treatment is not proper in such circumstances, Judge Sabraw explained: "Based on its review and weighing of the evidence, the Court finds that Plaintiff[s] have not demonstrated the commonality required for class certification. In particular, the Court has relied on the deposition and declaration testimony indicating that the work performed by the GMs varied significantly from store to store and week to week."

In *Home Depot*, assistant store managers claimed they were misclassified as exempt and sought

---

[10]      *Wang* v. *Chinese Daily News, Inc.*, 231 F.R.D. 602 (C.D. Cal. 2005). *Wang* is inapposite here, inasmuch as the positions at issue were not in retail management (the class were employed in a variety of non-managerial positions for a newspaper) and there was no significant variation among employees in the same position with respect to how they performed their jobs. Indeed, most of the positions at issue in *Wang* were conceded by the defendant as being non-exempt. *Wang* thus did not pose the kind of individualized determinations of exempt status going to the heart of liability that are present here.

[11]      *Dunbar* v. *Albertson's, Inc.,* Alameda Superior No. RG04-146362 (June 28, 2005); *In re Home Depot Overtime Cases*, Riverside Superior No. JCCP4229 (Feb. 2, 2006).

class certification.  Here again, class certification was denied.  The plaintiffs argued that Home Depot stores were virtually identical and that the duties and activities of the putative class members varied little from one to another.  Following his review of the evidence, however, Judge Webster concluded that "the reality is considerably different"; putative class members performed their jobs very differently from one another.  For example, stores varied in terms of store volume and number of hourly employees; the nature of work changed from store department to store department; work assignments differed depending on shift assignment and staffing, such as when the store manager was absent and the assistant store manager acted as manager; some assistant store managers had more experience than others; and "intangible differences in personality and inclination" made it "inevitable that there [would] be differences even when similar tasks are being performed."  Because of those differences, Judge Webster recognized "a basic fairness concern arises in the use of the class action procedure."  If the defendant prevailed by showing that 50.1% of the class performed exempt work more than half of the time, 49.9% of the class members—by hypothesis, the plaintiffs who in an individual case should have won—would be saddled with an adverse finding that they individually did not deserve.  That is not due process.

Here, unlike each of the above cases dealing with second- or third-tier managers within the store, Rite Aid Store Managers are first-tier managers: they are the highest-level authority in the store and the only employees classified as exempt.  RSE 9.  However, similar to those cases, the evidence here (including two self-audits, the observational study, and numerous declarations) shows that Store Managers perform their jobs very differently from one another.  This variance spawns innumerable individualized issues, not appropriate for class treatment.

### 3. Plaintiff's Claim That How Individual Store Managers Spend Their Time Is Irrelevant at the Class Certification Stage Simply Ignores the Requirement That There Be a Predominance of Common Issues.

The amount of time individual Store Managers spend on tasks that can be categorized as either exempt or non-exempt under California law is central to the relevant inquiry on this motion for class certification: whether common issues predominate.  As the Supreme Court has recognized, "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Gen. Tel. Co. of the Southwest* v. *Falcon*, 457 U.S. 147, 160 (1982) (internal citations and quotations omitted); *see also Staton* v. *Boeing Co.*, 327 F.3d 938, 954 (9th

Cir. 2003) (requiring "inquiry into the substance of the case…to ascertain satisfaction" of Rule 23's requirements); *Blackie* v. *Barrack*, 524 F.2d 891, 897 (9th Cir. 1975) (noting class issues are not always divorceable from issues of merit; district court is required to base grant or denial of class certification on material sufficient to rule on compliance with each of Rule 23's requirements, including material relevant to both class issues and merit). Here, plaintiff frames the common question by pointing to the classification of Store Managers as exempt and corporate standardization of certain policies and procedures. Plaintiff makes the sweeping and unfounded allegation that all Store Managers perform the exact same job in the exact same way, and argues that any showing by Rite Aid otherwise would be "merits-based" and should not be considered on his motion for class certification. Plaintiff's position is untenable.

California law makes clear that the core issue of the managerial exemption is whether the manager spends most of his or her time on exempt job duties, and that this must be examined on an individualized basis. *See Ramirez*, 20 Cal. 4th at 797 (focusing exclusively on whether individual spends more than half his or her time on exempt functions). If plaintiff were correct that all Store Managers performed exactly the same job duties and spent exactly the same amount of time on them, then perhaps the common issues would predominate and class certification would be appropriate. But that is not this case. Rite Aid's evidence overwhelmingly shows that, in fact, each Store Manager performs a different combination of job duties, that each performs those job duties in different ways, and that each spends a varying amount of time on those duties. Because the propriety of an individual Store Manager's exempt classification cannot be determined without assessing those factors, and that determination is necessarily individualized, not common, the requirement of a predominance of common issues is not met.

### 4. Plaintiff's Argument That Rite Aid's Standardized Processes Necessarily Render Store Managers Non-Exempt Has Been Repeatedly Rejected by the Courts and Should Be Rejected Again Here.

Moreover, plaintiff's argument that standardized policies and procedures carries the day on class certification misses the mark. Like most large businesses, Rite Aid has established processes for various functions, such as merchandising (including displays and pricing), customer service, store appearance and maintenance, financials, and human resource policies and procedures; these comprise "best practices" it would like its stores to follow. RSE 46. However, these processes do not, as plaintiff supposes, negate the exercise of managerial independence by the Store Managers who lead the processes and

1  transform the question of their exempt status into a classwide one.  RSE 47-48.

2  As the self-audits demonstrate, Store Managers are expected to, and do, exercise their discretion

3  and judgment to direct and manage Rite Aid's processes.  *See* RSE 35-36.  While Rite Aid's processes

4  facilitate operations, they are carried out differently from store to store, and do not specifically direct

5  how a Store Manager must execute a task or accomplish an objective.  RSE 47-48.  Moreover, there are

6  numerous instances where the processes cannot be executed because of factors such as store configura-

7  tion, merchandise and personnel levels.  It is up to the Store Manager to exercise leadership skills and

8  adjust, supplement, and modify the processes according to particular circumstances.  *Id.*

9  Courts repeatedly have recognized that even the most regimented company needs exempt em-

10  ployees—supervisors—who make judgment calls.  *See, e.g., Donovan* v. *Burger King Corp.* ("*Burger

11  King I"), 672 F.2d 221, 226 (1st Cir. 1982) ("The supervision of other employees is clearly a manage-

12  ment duty....The fact that Burger King has well-defined policies, and that tasks are spelled out in great

13  detail, is insufficient to negate this conclusion."); *Murray* v. *Stuckey's Inc.*, 939 F.2d 614, 619 (8th

14  Cir. 1991) ("[T]he manager of a local store in a modern multi-store organization has management as his

15  or her primary duty even though...discretion...may be limited by the company's desire for standardiza-

16  tion and uniformity."); *Donovan* v. *Burger King Corp.* ("*Burger King II"), 675 F.2d 516, 521-22 (2d

17  Cir. 1982) (assistant managers exempt; rejecting a claim that uniform procedures foreclosed the exercise

18  of discretion and independent judgment).[12]  As in these cases, the existence of Rite Aid processes does

19  not mean that Store Manager discretion is constricted to the point of nonexistence.  In fact, ensuring

20  subordinates comply with such corporate policies and processes itself qualifies as employee supervision

21  and is thus considered a management function. *See e.g.*, *Baldwin* v. *Trailer Inns, Inc.*, 266 F.3d 1104,

22  1117 (9th Cir. 2001); *citing Burger King I*, 672 F.2d at 226 ("Ensuring that company policies are carried

23  out constitutes the very essence of supervisory work.").

24  ///

---

25  [12]  *Accord Russell* v. *Mini Mart, Inc.*, 711 F. Supp. 556, 559 (D. Mont. 1988) (store manager was

26  exempt notwithstanding detailed policies and procedures that to some extent curbed his discretion);
   *Horne* v. *Crown Cent. Petroleum, Inc.*, 775 F. Supp. 189, 191 (D.S.C. 1991) (same); *Moore* v. *Tractor

27  *Supply Co.*, 352 F.Supp.2d 1268, 1277-78 (S.D. Fla. 2004) (reliance on company policy, as dictated by
   written and oral instructions, standardized computer programs, and oversight by senior management was

28  not sufficient to negate discretion and render an employee non-exempt as a manager.)

1

**B.     A Class Action Would Not Be Superior to—and, in Fact, Would Be Demonstrably Inferior to—Other Available Procedures for Resolving the Claims Presented Here.**

2

3      Plaintiff cannot demonstrate Rule 23(b)(3)'s requirement that class treatment is "superior to

4      other available means for the fair and efficient adjudication of the controversy." The availability, acces-

5      sibility, and desirability of individualized means of redress strongly militates against class certification.

6      *See Poulos* v. *Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004); *Zinser*, 253 F.3d at 1190-92.

7      "Where damages suffered by each putative class member are not large, [23(b)(3)(a)] weighs in

8      favor of certifying a class action." *Zinser*, 253 F.3d at 1190.  However, the potential for a relatively

9      large recovery in this case means that Store Managers have sufficient incentive to pursue individual

10     claims, and that a class action is not a superior procedure.  Here, at an average salary of $52,500, even

11     the lowest-paid Store Manager stands to gain thousands of dollars in this case, and others substantial six-

12     figure recoveries.  Individual Store Managers have plenty of incentive to pursue their claims.  *See Home*

13     *Depot* ("Using Home Depot's conservative 15 hour per week overtime concession, the lowest paid

14     [class member] would stand to recover at least $25,000/year, plus interest, penalties and attorney

15     fees...[which is] sufficient incentive to pursue a meritorious claim"); *Zinser*, 253 F.3d at 1191 ("the

16     [$50,000] alleged to be in controversy for each putative class member does not argue persuasively for

17     class certification"); *Albertson's* (putative class members could pursue individual overtime claims

18     "worth over $30,000...[which] would make the claim worth pursuing.").

19     As to Rule 23(b)(3)(D)'s requirements, the Ninth Circuit has already held that even where there

20     are some common questions of causation or liability, if individual fact questions remain as to liability

21     for each and every class member, certification is inappropriate.  "If each class member has to litigate

22     numerous and substantial separate issues to establish his or her right to recover individually, a class ac-

23     tion is not 'superior.'"  *Zinser*, 253 F.3d at 1192 (affirming denial of class certification) (adopting *Haley*

24     v. *Medtronic, Inc.*, 169 F.R.D. 643, 654 (N.D. Cal. 1996) ("Given the fact that approximately 66,000

25     individuals had these leads implanted, there are potentially 66,000 different instances that the Court

26     would have to examine to determine if defendant's conduct was the real cause of injury for each poten-

27     tial plaintiff.  Under these circumstances, there are just too many individual issues for the Court to man-

28     age for class adjudication to be deemed superior, even though there is a common nucleus of facts con-

cerning defendant's conduct.")).  Here, the applicable state law requires an *individualized* examination because the dispute is not whether certain tasks were exempt or not exempt, but whether each individual Store Manager spent more than 50% of his or her time performing exempt tasks.

There are at least two preferable alternative methods by which aggrieved persons might proceed. First, an aggrieved Store Manager may file an administrative complaint with the California Labor Commissioner, who will adjudicate the claim within 90 days in a simple hearing.  Cal. Lab. Code § 98(a).  Unsatisfied claimants may appeal to the Superior Court for *de novo* review and the Labor Commissioner may represent the claimant for free.  *Id.* §§ 98.2(a), 98.4.  Second, an aggrieved Store Manager may initiate an individual civil action for unpaid overtime.  Either of these individual actions can be brought very economically—indeed, entirely at the expense of the losing defendant.  *See* Cal. Lab. Code § 218.5 (authorizing attorneys' fees and costs to prevailing plaintiff in civil action).  Because an individual complaint is a viable avenue of relief, there is no need to aggregate claims in a class.  *E.g.*, *Mathews* v. *Book-of-the-Month Club, Inc.*, 62 F.R.D. 479, 479-80 (N.D. Cal. 1974) (denying certification; persons could sue and obtain attorneys' fees and substantive relief; "statutory [remedies], including attorneys' fees, are a substitute...[for] the small litigant, for the class action device").

Because there are two effective alternatives to class litigation—both substantially cost-free, and one (at the claimant's option) lawyer-free—the requirement of superiority is not met.

### C.     If a Class Were Certified, Trial Would Be Unmanageable.

The proposed class here also cannot meet the Rule 23(b) manageability requirements.  *E.g.*, *Staton*, 327 F.3d at 953 (directing district court to consider manageability; "We have some concerns, largely related to litigation management, as to whether the case could be maintained as a class action if the litigation continues.").  A "suit could become unmanageable and little value would be gained in proceeding as a class action…if significant individual issues were to arise consistently."  *Barnes* v. *Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998); *accord In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005).  "[W]hen the defendant's affirmative defenses may depend on facts peculiar to each plaintiff's case, class certification is erroneous."   *Broussard* v. *Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998).  The predominance of individualized issues—as to credibility, liability, and damages—would render a trial in this case unmanageable.  As the court observed in *Home Depot*:

Home Depot has a fundamental due process right to raise affirmative defenses as to individual plaintiffs. This right to raise affirmative defenses as to individual plaintiffs, in conjunction with the individual nature of damages in this case makes it difficult to see how class certification would substantially benefit the court.

*See also Wal-Mart* ("For each AM, Defendant is entitled to raise exempt status as a defense and to present evidence showing that the AM actually did perform primarily exempt tasks.…[S]uch proof will [] be highly individualized."); *Johnson* v. *Ford Motor Co.*, 35 Cal. 4th 1191, 1210 (2005) ("In a class action, once the issues common to the class have been tried, and assuming some individual issues remain, each plaintiff must still by some means prove up his or her claim, allowing the defendant an opportunity to contest each individual claim on any ground not resolved in the trial of common issues."); *Sav-on*, 34 Cal. 4th at 329-30 ("Unquestionably...a defendant is entitled to defend against [a class action] complaint by attempting to demonstrate wide variations in the types of stores, and consequently in the types of activities and amounts of time per workweek the [putative class members] in those stores spent on different types of activities."). This is an independent reason why class certification is inappropriate here.

Assume a class were certified (of possibly more than 1,100 individuals, RSE 8). At trial, Rite Aid would have the right to defend itself by establishing exempt status on an individual-by-individual basis, for each and every member of the class. Determining the dispositive facts for each individual Store Manager, and applying the law to those facts, would require "extensive examination of the circumstances surrounding each" situation. *City of San Jose* v. *Superior Court,* 12 Cal. 3d 447, 461 (1974). Proof of the very "fact of the actual violations," not to mention any "resulting damages," would "raise substantial individual questions." *Brown* v. *Regents of the Univ. of California*, 151 Cal. App. 3d 982, 991 (1984). Specifically, Rite Aid would submit all the self-audits and the other evidence it has supporting the validity of the self-audit results. Plaintiff would have to call Store Managers to disavow their self-audits. To rebut this testimony, Rite Aid then would call witnesses who knew how each Store Manager spent his or her time, such as supervising District Managers, human resource representatives, and subordinates. Individual-by-individual, the jury would have to (i) first resolve credibility issues as to each Store Manager; and (ii) then determine liability—*i.e.*, whether that Store Manager's work pattern evidenced that he or she was spending more than 50% of his or her time on managerial duties, and whether any misrepresentation by the Store Manager to Rite Aid about his or her time precludes recov-

ery.  The individualized evidence relevant to one Store Manager would have no bearing on the next, yet the trial would need to continue until evidence as to each and every one of the nearly 1,100 class members was presented.  This is not the stuff of class actions.  *In re Allstate*, 400 F.3d 505, 508 (7th Cir. 2005) (reversing class certification in part on unmanageability grounds, noting that if case proceeded on class basis "more than a thousand individual hearings will be necessary.").

The trial in *Lyles* v. *K-Mart Corp.*, 519 F. Supp. 756 (M.D. Fla. 1981), illustrates how this Court would get bogged down if it allowed a class action here to proceed to trial.  In *Lyles*, two assistant managers challenged their exempt classification.  Despite the fact that each plaintiff had, during their regular course of employment, filled out self-audit forms (similar to those filled out by the Store Managers here) attesting that the significant majority of their time (70% and 92%) was spent on management tasks, at trial they changed their story and contended that they had in fact spent only 10-20% of their time on such functions.  *Id.* at 757-58.  In deciding whether the plaintiffs were exempt or non-exempt, the court had to evaluate several different forms of evidence specific to each of the plaintiffs—including their self-audit forms, and specifics related to the organization of the store "zone" they managed and their duties within that zone, as well as testimony regarding each plaintiff from the store manager, personnel manager, and other assistant managers and employees.  *Id.* at 757-62.  This same type of detailed evidence would need to be submitted and analyzed for each Store Manager here to determine if he or she is properly classified, further demonstrating that this case is not suitable for class certification.

### D.    Plaintiff Also Fails to Meet the Rule 23(a) Requirements.

#### 1.    Plaintiff's Claims Are Not Typical of The Class.

"The essence of [Rule 23(a)(3)'s] typicality requirement is captured by the notion that as goes the claim of the named plaintiff, so go the claims of the class." *Deiter* v. *Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006), *accord Sprague* v. *Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998).  That is not the case here.  The evidence shows there is no "typical" store nor any "typical" class member.  Each Store Manager's daily duties—and the amount of time he or she spends on those duties—vary widely based upon a variety of store-specific factors, as well as the manager's own personal experience and management styles.  RSE 14, 47-48.  This is confirmed by the Store Managers' self-audits and the LECG observational study, which reflect a wide and extremely varied range of time spent on exempt

1   versus non-exempt tasks.  Thus, there is no single employee who can capture this variety of behaviors;

2   no single employee whose claim should fairly determine those of everyone else.

3       Moreover, *if* there were to be a single employee whose claim was representative of the putative

4   class (which there is not), that single employee would surely not be plaintiff.  Plaintiff alleges that less

5   than 50% of his time was spent on non-exempt tasks (RSE 54); only a very small portion of the overall

6   class (*e.g.*, only 17.6% in 2005 and only 14% in 2006) reported the same on the self-audits (*see* RSE 35-

7   36).  Therefore, plaintiff cannot be said to be typical of the class for Rule 23(a)(3)'s purposes.

8                    **2.    Plaintiff Is an Inadequate Class Representative.**

9       Rule 23(a)(4) further requires that a class representative must "fairly and adequately protect the

10  interests of the class."  The Supreme Court has left no doubt: a district court must "evaluate carefully the

11  legitimacy of the named plaintiff's plea that he is a proper class representative under Rule 23(a)."  *Gen.*

12  *Tel. Co. of the Southwest*, 457 U.S. at 160.  Plaintiff is not an adequate representative for two key rea-

13  sons:

14      First, plaintiff has demonstrated on several occasions—both within the context of this litigation

15  and prior to its inception—that he is neither credible nor trustworthy.  A plaintiff who demonstrates a

16  lack of credibility is an inadequate class representative.  *Savino* v. *Computer Credit, Inc.*, 164 F.3d 81,

17  87 (2nd Cir. 1998) ("To judge adequacy of representation, courts may consider the honesty and trust-

18  worthiness of the named plaintiff;" denial of class certification not abuse of discretion where inconsis-

19  tencies in plaintiff's testimony "would create serious concerns as to his credibility at any trial.").[13]  In

20  this action, plaintiff's lack of credibility is appalling:

21          ▪    In his deposition, plaintiff responded to no fewer than 212 questions with the response of

22

23  [13]    *See also Kirkpatrick* v. *J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987) ("named plain-
    tiffs might not qualify as adequate class representatives because they do not possess the…integrity nec-
24  essary to fulfill the fiduciary role of class representative"); *Kline* v. *Wolf*, 702 F.2d 400, 402-03 (2nd Cir.
    1983) (denial of class certification; preliminary finding of lack of credibility sufficient to support court's
25  conclusion that plaintiff's representation of class would be less than adequate); *Folding Cartons, Inc.* v.
    *American Can Co.,* 79 F.R.D. 698, 703 (N.D. Ill. 1978) (denial of class certification; plaintiff who en-
26  gaged in deceptive selling scheme "inadequate representative of the interests of any purported class" and
    inadequate "to assume the fiduciary position of a class representative"); *In re Proxima*, No. 93-1139-
27  IEG, 1994 WL 374306, at *17 (S.D. Cal. May 3, 1994) ("It is proper for this Court to consider [plain-
    tiff's] integrity in assessing his adequacy as a class representative"); *Armour* v. *City of Anniston*, 89
28  F.R.D. 331, 332 (N.D. Ala. 1980) (same).

"don't know" or "don't recall"—including to questions as basic as when he got married, where and when he went to school and what degrees he received, and any details (dates, job titles, duties) of his pre- and post-Rite Aid employment.  RSE 59.  However, plaintiff somehow recalled with amazing specificity all details related to the merits of his claim regarding the exact percentages of time he spent on various managerial and non-managerial functions and how many hours he worked as a Store Manager.  *Id.*

- Also at his deposition, plaintiff was asked to break down his time in percentages among a list of 15 specified categories of tasks typically performed by Rite Aid Store Managers; he was instructed that the total amount of time should equal 100%.  Plaintiff refused to follow this instruction and instead gave percentages totaling an implausible 302%.  RSE 60.

- Plaintiff was terminated for violation of company policy surrounding his continued sale of several hundred glucose meters to a reseller at a discount, despite having been instructed by his District Manager to discontinue doing so, resulting in a loss of over $25,000 in gross profit to Rite Aid.  RSE 58.

- In the job application plaintiff filled out for his post-Rite Aid employer (PetSmart), plaintiff made several statements that are demonstrably false and/or contradict his sworn deposition testimony, including:  (a) that plaintiff was employed by Rite Aid from 2001 to 2004 (plaintiff was not hired until October 2002) (*see* RSE 50, 61); (b) that plaintiff had never been discharged from any prior employment (plaintiff was terminated from Rite Aid for sales fraud) (*see* RSE 58, 61); (c) that plaintiff's supervisor was Roger Ceballos (Ceballos was a Human Resources Manager; plaintiff was supervised by Rite Aid District Manager John Petit) (*see* RSE 52, 61); (d) that plaintiff's supervisor would rate his work as "excellent" (Petit sharply criticized plaintiff's job performance and ultimately fired him for sales fraud) (*see* RSE 57-58, 61); (e) that plaintiff's duties as a store manager at Rite Aid were to "oversee all store operations" (plaintiff now claims that his duties almost entirely consisted of routine non-management tasks) (*see* RSE 54, 61); and (f) that plaintiff worked "45/50" hours per week at Rite Aid (plaintiff repeatedly claimed in

1    deposition that he worked 65 hours per week) (*see* RSE 61).

2        Plaintiff's demonstrated pattern of inconsistency and dishonesty, especially when it comes to

3    matters important to his claims here, would be attributed to other class members, to their disadvantage,

4    thus further undercutting his suitability as a class representative. *E.g.*, *Kaplan* v. *Pomerantz*, 132 F.R.D.

5    504 (N.D. Ill. 1990) ("[T]he Court cannot in good conscience allow this case to continue as a class ac-

6    tion with plaintiff serving as a class representative…" where plaintiff's actions "evidence a willingness

7    to give intentionally false and misleading testimony in an effort to further his interests in this litigation.

8    Under these circumstances, allowing him to prosecute this case as a class action would not be fair to the

9    Court, to the defendants, or to the other individuals whose interests plaintiff purports to represent…" as

10   "[a] plaintiff with credibility problems…[has] interests antagonistic to the class.").

11       Second, as noted above, plaintiff alleges that he performed managerial duties well below 50% of

12   the time, whereas the vast majority of the putative class reports in the self-audits that they perform

13   managerial duties well above 50% of the time.   *See* section IV.D.1, *supra*; RSE 35-36, 54.  Conse-

14   quently, even crediting plaintiff's claims as to how he spent his time, this evidence shows that he does

15   not share the common characteristics of the very class he purports to represent.

16       The bottom line is that plaintiff is an inadequate representative for the broadly-defined class he

17   seeks to represent.

18   **V.    CONCLUSION**

19       Plaintiff cannot meet his heavy burden that class certification is warranted.  Plaintiff's motion for

20   certification should be denied.

21       Dated:  June 26, 2006.        JEFFREY D. WOHL
                                        JULIE A. WILKINSON
22                                      RISHI N. SHARMA
                                        PAUL, HASTINGS, JANOFSKY & WALKER LLP
23

24                                      By:    /s/ Jeffrey D. Wohl
                                                  Jeffrey D. Wohl
25                                            Attorneys for Defendant
                                               Rite Aid Corporation
26

27

28