JEFFREY D. WOHL (Cal. State Bar No. 96838)
JULIE A. WILKINSON (Cal. State Bar No. 209180)
RISHI N. SHARMA (Cal. State Bar No. 239034)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
55 Second Street, 24th Floor
San Francisco, California  94105
Telephone: (415) 856-7000
Facsimile: (415) 856-7100
jeffwohl@paulhastings.com
juliewilkinson@paulhastings.com
rishisharma@paulhastings.com

Attorneys for Defendant
Rite Aid Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRAG TIERNO, individually, and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>RITE AID CORPORATION, and DOES 1 through 25, inclusive,<br><br>Defendants. | No. C-05-02520-TEH<br><br>**RITE AID'S SUMMARY OF EVIDENCE IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date:  July 17, 2006<br>Time:  10:00 a.m.<br>Courtroom:  12, 19th Floor<br>Judge:  Hon. Thelton E. Henderson<br><br>Complaint filed:  May 9, 2005<br>Trial date:  None set |

Defendant Rite Aid Corporation ("Rite Aid") submits this summary of the evidence in opposition to plaintiff Prag Tierno's motion for class certification.

The "Fact" column contains numbered facts, which are cited in Rite Aid's opposition brief as "RSE [number]."  In the "Evidence" column, the following citation conventions are used:

1.    Declarations filed with Rite Aid's opposition papers are cited as "[Name] Decl., ¶ __."

2.    Excerpts from depositions filed with Rite Aid's opposition papers are cited as "[Name] Depo., [page:line-page:line]."  Unless the deposition excerpt was filed with plaintiff's papers, the deposition excerpts are attached to the Declaration of Jeffrey D. Wohl.

Dated: June 26, 2006.            JEFFREY D. WOHL
                                 JULIE A. WILKINSON
                                 RISHI N. SHARMA
                                 PAUL, HASTINGS, JANOFSKY & WALKER LLP


                                 By: _/s/ Jeffrey D. Wohl_____
                                            Jeffrey D. Wohl
                                         Attorneys for Defendant
                                          Rite Aid Corporation

| Fact | Evidence |
|---|---|
| **Background on Rite Aid** ||
| 1.  Rite Aid is a national drugstore chain that currently operates approximately 590 stores in California. | Sapp Decl., ¶ 4. |
| 2.  There is no typical Rite Aid store.  Rite Aid stores in California differ in many ways, such as with respect to their sales volume and complexity, including size, geographic location, market, workforce (including competency and job positions utilized), configuration, organizational structure, merchandise selection, services offered, number of store entrances, and hours of operation. | Sapp Decl., ¶ 5; Petit Decl., ¶ 4; Toney Decl., ¶ 4. <br><br> *See also* Buchanan Decl., ¶ 11; Doubleday Decl., ¶ 12; Dwillis Decl., ¶ 14; Ferguson Decl., ¶ 15; Fiss Decl., ¶ 6; J. Hicks Decl., ¶ 13; Hindman Decl., ¶ 11; Migranyan Decl., ¶ 13; Skeen Decl., ¶ 11. |
| 3.  The physical size of California Rite Aid stores ranges from as small as approximately 1,200 square feet to as large as 61,000 square feet, with most between 14,000 and 26,000 square feet. | Sapp Decl., ¶ 6. |
| 4.  The geographic location of California Rite Aid stores varies, from downtown shopping districts, suburban shopping malls, strip malls, and more rural locations. | Sapp Decl., ¶ 7. |
| 5.  The annual sales volume of a California Rite Aid store ranges from less than $100,00 to more than $23.5 million, with most being between $4.4 million to $9.2 million. | Sapp Decl., ¶ 8. |
| 6.  The number of hourly employees in a California Rite Aid store varies, from under 5 to 65 or more, with most having between 16 and 29 employees. | Sapp Decl., ¶ 9. |
| 7.  The variety of departments in each California Rite Aid store varies, with many stores having one or more of the following departments:  General Nutrition Center ("GNC"), garden supplies, nursery, one-hour photo processing, and ice cream. Additionally, several California Rite Aid stores are open 24 hours a day. | Sapp Decl., ¶ 10. |
| **Background on the Store Manager Position** ||
| 8.  Rite Aid currently employs approximately 590 individuals in California in the position | Sapp Decl., ¶ 11. |

| Fact | Evidence |
|------|----------|
| of Store Manager.  Over the period from May 9, 2001 (four years before plaintiff filed his complaint), to present, Rite Aid has employed approximately 1,100 individuals as a Store Manager in a California Rite Aid store. | |
| 9.  Store Managers are the highest authority at the store and are the only exempt employees in each store.  Store Managers are in charge of and directly supervise all front-end (non-pharmacy) operations of the store.  Assisting Store Managers in running the front-end operations are Assistant Managers and Key Associates/Shift Supervisors (both non-exempt positions). Store Managers also indirectly supervise all pharmacy operations at their store, which are directly supervised by Pharmacy Managers. | Sapp Decl., ¶ 13. *See also* RSE 10, *infra*. |
| 10.  Store Mangers can directly or indirectly manage from 5 to 65 or more employees. | Sapp Decl., ¶¶ 9, 13. Barksdale Decl., ¶ 5 (responsible for staff of 15 to 25 employees); Buchanan Decl., ¶ 4 (staff of 40); Doubleday Decl., ¶ 6 (staff of 15); Dwillis Decl., ¶ 6 (staff of 20); Ferguson Decl., ¶ 6 (staff of 35); Fiss Decl., ¶ 4 (staff of 32); J. Hicks Decl., ¶ 5 (staff of 26); Hindman Decl., ¶ 5 (staff of 22); Migranyan Decl., ¶ 6 (staff of 30); Mueller Decl., ¶ 5 (staff of 42); Skeen Decl., ¶ 5 (staff of 35 to 60); Vivanco Decl., ¶ 5 (staff of 16 to 26). |
| 11.  Commensurate with their considerable responsibilities, the average salary for a California Store Manager ranges from approximately $50,000 to $55,000 per year, for an overall average of $52,500 per year, over the period from May 2001 (four years before the complaint in this action was filed) through 2006. | Sapp Decl., ¶ 14. |
| 12.  In addition, Store Managers are eligible for bonuses. | Sapp Decl., ¶ 14. |
| 13.  A Store Manager's principal duties and responsibilities require the exercise of independent judgment and discretion.  A Store Manager's duties include: interviewing and hiring employees; promoting employees; evaluating job performance (including giving job coaching and training, as well as formal | Sapp Decl., ¶¶ 12, 15, Exh. A; Toney Decl., ¶¶ 5-6. Buchanan Decl., ¶¶ 4, 6-11; Doubleday Decl., ¶¶ 6, 8-12; Dwillis Decl., ¶¶ 6, 8-14; Ferguson Decl., ¶¶ 6, 8-15; Fiss Decl., ¶¶ 4, 6-13; J. Hicks Decl., ¶¶ 5, 7-14; Hindman Decl., ¶¶ 5, 7-11; Migranyan Decl., ¶¶ 6, 8-13; Mueller Decl., ¶¶ 5, |

| | Fact | Evidence |
|---|---|---|
| | written reviews); adjudging misconduct and calibrating appropriate discipline; participating in terminating employees; directly supervising all front-end employees and indirectly supervising all pharmacy employees; managing and controlling store profit and loss, including but not limited to cash handling and practices, payroll, inventory levels, shrink, maintenance, and other operational needs as required; handling personnel and customer issues as they arise; prioritizing and delegating tasks; managing daily workforce levels; making judgment calls regarding how merchandise should be displayed or moved from the backroom; and directing hourly staff to accomplish objectives. | 9-12; Skeen Decl., ¶¶ 5, 7-11.<br><br>J. Hicks Decl., ¶¶ 7-8 ("[Store Managers are] not hired/promoted for their brawn, but for their brain. In other words, they should conduct themselves like orchestra conductors. Store Managers should not be out on the floor playing an instrument. Instead, a successful manager stands back, decides where to position his players and what they should do, and keeps them in line. Failure to do so means the manager is doing something wrong…. [I]t is not their job to [personally] do what needs to be done, but to figure out how to schedule and deploy their staff to get the job done. If a manager does a good job in training his employees and schedules them properly, then he will not need to perform manual or hourly tasks himself. The Store Manager should spend his time on tasks such as assessing what sells well in his store and what to order; choosing what items to display on endcaps (the rounded ends of the aisles) to increase sales; deciding how to adjust our floor displays given variations in season, weather, or local demand; reviewing the Assistant Manager's merchandising decisions and making sure he has designed displays that will sell; identifying trends in our out-of-stocks and figuring out the cause (for example, is the warehouse out of stock, or do we have an ordering problem?); and talking to the pharmacy staff about what problems they are having and how we can improve.").<br><br>*See also* RSE 53, *infra* (plaintiff admits performing several management duties). |
| 14. | Which particular duties a Store Manager performs, and how he or she performs them, is for the Store Manager to determine day by day. How each particular Store Manager performs his or her job, and which particular duties he or she performs each day, differs by individual and varies based on a number of factors, including managerial style and experience of the Store Manager, store location, store volume, size, staffing levels, staff performance and competency, hours of operation, merchandise selection, services offered, number of store entrances, and seasonal changes. | Sapp Decl., ¶ 16.<br><br>Petit Decl., ¶ 5 ("[A] store's geographic location demands that a Store Manager act in different ways depending upon the customer base. Some stores are shopped 'harder' than others—*i.e.*, they have a much larger customer flow, and thus conditions of the store demand that the Store Manager assign more resources to the maintenance of the store, and spend more time on tasks such as resolving customer service needs and attending to security concerns. Another example is that Store Managers in stores serving large non-English speaking populations must ensure that the store is always properly staffed with individuals who speak those languages. Additionally, a Store Manager in those stores would need to order and adjust their inventories according to customer preference, which is often influenced by ethnicities |

| Fact | Evidence |
|------|----------|
|      | of the customer base."). |
|      | Toney Decl., ¶¶ 7, 8 ([A] Store Manager in a store with a higher sales volume must be able to plan and organize for a faster-paced business; this usually means that the Store Manager will have a greater number of associates, and it requires that the Store Manager spend more time planning and ensuring that the store is properly staffed to meet customer needs (which vary depending upon day of the week and time of the day), that the Store Manager ensures that a sufficient number of associates are assigned to functions such as resetting and restocking merchandise, and ensuring that associates are trained to do the same. In contrast, a Store Manager at a lower sales volume store will generally have fewer associates, and therefore must spend more time prioritizing which tasks need to be accomplished and when, and spend more time ensuring that the store's associates are able to multi-task.  Additionally, a Store Manager in a store in an urban environment faces challenges different than their counterparts in suburban stores.   For example, a Store Manager in an urban store needs to delegate more time and attention to security issues; there is often a greater turnover of associates (and a lesser qualified pool of applicants) and therefore the Store Manager needs to spend more time on interviewing, hiring and training; urban stores tend to have a faster-paced environment with smaller dollar value purchases;  there are often cultural and language variations in the customer population that the Store Manager needs to be aware of, which will effect both store inventory (types and quantities of products carried) and appropriate employee training to reflect those varying client needs."). |
|      | Mueller Decl., ¶ 11 ("Even though Rite Aid has company guidelines that are used to ensure the uniformity and success of its stores, as a Store Manager, I am required to exercise my independent judgment and discretion on a daily basis.  For example, even though there are company guidelines on how to deal with customers' special requests, there are always situations when I have to use my judgment as to how to handle individual situations that fall outside of the guidelines.  I also take special steps to help generate sales in my stores such as holding sidewalk sales in front of the store, getting special pricing on items such as soda and liquor and putting up special signage to attract customers to various items.  In addition, I make decisions on |

| Fact | Evidence |
|------|----------|
| | how merchandise will be displayed in my store and I decide which employees will be assigned the task of setting up the displays."). |
| | Hindman Decl., ¶ 11 ("There are several factors that will lead Store Managers to perform their jobs differently. For example, higher volume stores will impose different demands on a Store Manager's time than lower volume stores.  Differences in payroll budget also will change how a Store Manager performs his job.  Sometimes stores with the same volume will have different payroll budgets.  Yet, both stores are tasked with achieving the same goal of increasing sales.  The larger your staff the easier it is to delegate tasks to that need to be completed to others instead of trying to accomplish them yourself.  In addition, the experience of the Store Manager and his staff will make a difference.  More experienced Store Managers will know that delegating tasks instead of trying to do them yourself is a much more effective means of running a store.  Newer Store Managers may not know how and what to effectively delegate.  Similarly, newer employees will require more guidance and training than more seasoned employees who can be trusted to accomplish their tasks without much supervision."). |
| | Skeen Decl., ¶ 11 ("There are several factors that will lead Store Managers to perform their jobs differently.  For example, there are some stores that make $4 million per year, whereas the last store I ran made $17 million a year.  The fact that we have such different sales volumes meant that we had some differences in the merchandise we sold, as well as significantly different staffing levels.  Thus, we necessarily would find different ways to accomplish the same goal—maximizing profits.  In addition, tenure in the position will also cause differences in the way Store Managers perform their jobs.  New Store Managers may have to be more hands on and involved in the store operations in order to gain the trust and respect of their staff, while more seasoned Store Managers may be able to back off and allow their employees more freedom.  This is also true for the store staff.  Newer employees will require more training and direction, while employees who have worked for Rite Aid for a while will not need as much guidance.  These differently tenured employees will make different demands on the time of the Store Manager."). |
| | *See also* Buchanan Decl., ¶¶ 6-11; Doubleday |

| Fact | Evidence |
|---|---|
| | Decl., ¶¶ 8-12; Dwillis Decl., ¶¶ 8-14; Ferguson Decl., ¶¶ 8-15; Fiss Decl., ¶¶ 6-13; J. Hicks Decl., ¶¶ 7-14; Hindman Decl., ¶¶ 7-11; Migranyan Decl., ¶¶ 8-13; Mueller Decl., ¶¶ 7-12; Skeen Decl., ¶¶ 7-11. |
| **Management Development Program** | |
| 15.   Before entering into a management position at a Rite Aid store, all new Store Managers are expected to complete Rite Aid's Management Development Program ("MDP"), an approximately eight- to ten-week, full-time management training program focusing on leadership skills. (The length of the program varies based upon how quickly the attendee grasps the program's materials, as well as due to scheduling issues that may arise during the holiday seasons and/or to accommodate trainer(s) vacation schedules.) | Sapp Decl., ¶ 17.   Ferguson Decl., ¶ 4 ("Before becoming a Store Manager, I participated in Rite Aid's Management Development Program ("MDP").  This was a ten-week program that taught me critical skills necessary to be a successful manager.  For example, I learned about how to effectively prioritize tasks that need to be accomplished, how to draft feasible employee schedules, how to control and maximize my payroll costs, and how to balance a large budget."). |
| 16.   During the MDP training, participants spend approximately one to two days per week in classroom training and two to four days per week in in-store training. Depending on the performance, progress and understanding of the attendee, the length of MDP training may be extended. | Sapp Decl., ¶ 18. |
| 17.   During the classroom portion, MDP attendees complete training modules on various topics, including: merchandising and marketing, store financials, inventory management, security management, store operations and administrative management, pharmacy operations, loss prevention, human resources, excellence in management, leadership and training, diversity, and Rite Aid policies and procedures. | Sapp Decl., ¶ 19. |
| 18.   MDP attendees are instructed and trained on Rite Aid's expectation Store Managers spend the majority of their time on managerial duties. | Sapp Decl., ¶ 20. |
| 19.   The in-store portion of the MDP provides hands-on training, working alongside a management trainer, on all facets of Rite Aid retail operations, including implementation of the modules taught in the classroom portion of the MDP, further | Sapp Decl., ¶ 21. |

| Fact | Evidence |
|---|---|
| training regarding company systems, programs, resource tools, policies and procedures, communications, methodologies, leadership, financials, operations, marketing, finance, and logistics, and specifics such as directing hourly staff in merchandising, providing customer service, processing inventory, coaching and discipline. | |
| **Rite Aid's Stated Expectations** | |
| 20.    Rite Aid communicates its expectations that Store Managers spend more than half of their time on exempt job duties in a variety of ways, including its extensive MDP training, periodic reminders, written communications, and self-audits administered to Store Managers. | Sapp Decl., ¶¶ 22, 23.<br><br>Petit Decl., ¶ 6 (District Manager) ("I regularly communicate this expectation to the Store Managers I supervise through written (including SYSMs (inter-company e-mail), Store Manager and District Manager Daily Tour Sheets, and store calendars) and verbal communications (telephone calls, one-on-one meetings with Store Managers, and monthly group Store Manager meetings), and during the annual performance evaluation process.")<br><br>Toney Decl., ¶ 9 (Regional Vice President) ("I regularly instruct the District Managers whom I supervise that they should be communicating this expectation to the Store Managers within their districts.  I also communicate this expectation directly to Store Managers when I make periodic visits to their stores and at other meetings with the Store Managers and District Managers.")<br><br>*See also* Doubleday Decl., ¶ 4 ("Rite Aid communicated to its Store Managers that it expected them to spend the majority of their time engaged in management activities during meetings with upper management and human resources personnel."); J. Hicks Decl., ¶ 4 ("Rite Aid has communicated to its Store Managers that it expects them to spend the majority of their time engaged in management activities during meetings and via e-mail."); Hindman Decl., ¶ 4 (same); Migranyan Decl., ¶ 4 (same); Mueller Decl., ¶ 4 (same). |
| 21.    Rite Aid further reinforces this managerial expectation through the annual performance review process, during which a Store Manager first completes a self-assessment; his or her District Manager ("DM") then reviews the self-assessment and completes a DM assessment; and the | Sapp Decl., ¶ 24; Petit Decl., ¶¶ 9-10, Exhs. A, B. |

| Fact | Evidence |
|---|---|
| Store Manager and DM then meet to discuss the assessments.  In the self-assessment, the Store Manager is supposed to list his or her principal objectives during the review period and report whether those objectives were achieved.  Store Managers are evaluated on such leadership dimensions as planning skills, organizing skills, controlling skills, communication, leadership, creativity and imagination, analytical ability, associate management and development, and hiring and promotion practices | |
| 22.   Store Managers who are not meeting Rite Aid's expectation that they spend more than 50% of their time on exempt duties are coached during the performance review process on how to improve their performance. | Sapp Decl., ¶ 25. |
| **Store Manager Self-Audits** | |
| 23.   Rite Aid, in its regular course of business, requires its California Store Managers to complete self-audits on a yearly basis. | Sapp Decl., ¶ 26. |
| 24.   In February 2005, Rite Aid commenced self-audits of all of its California Store Managers to determine whether they were meeting Rite Aid's expectations that they spend more than 50% of their time on exempt job duties. | Sapp Decl., ¶ 27. |
| 25.   Two self-audits have been conducted to date, in February 2005, and June 2006. | Sapp Decl., ¶¶ 27, 28, 32, 33, Exhs. C (February 2005 self-audits), D (June 2006 self-audits). |
| 26.   Through the self-audits, Rite Aid is able to identify Store Managers who report spending 50% or less of their time on exempt functions and to follow up with those Store Managers on an individual basis to correct their work balances.  Failing that, the self-audits provide the company with a basis to consider reclassifying those Store Managers who are unable to correct their work balances as non-exempt employees, without any diminution in total pay. | Sapp Decl., ¶ 29. |
| 27.   The self-audit form lists eight categories of management tasks and eight categories of non-management tasks, and asks each | Sapp Decl., ¶ 30, Exhs. C (February 2005 self-audits), D (June 2006 self-audits). |

| Fact | Evidence |
|------|----------|
| Store Manager to report the average percentage of work time spent on each task, with total percentages adding up to 100%. | |
| 28. The self-audit materials reiterate Rite Aid's expectation that Store Managers are expected to spend more than 50% of their time on exempt job duties. | Sapp Decl., ¶ 30, Exhs. C (February 2005 self-audits), D (June 2006 self-audits). |
| 29. The self-audit materials make clear that complete honesty is expected. | Sapp Decl., ¶ 31, Exh. B ("Please be candid. … All we want are your honest responses.") (emphasis in original). |
| 30. The self-audit materials make clear that a Store Manager will neither be rewarded nor punished based on how he or she answers the self-audit. | Sapp Decl., ¶ 31, Exh. B ("[N]o adverse action will be taken against you regardless of how you respond.  Similarly, you will not receive any reward or benefit based on how you answer."). |
| 31. The self-audit materials make clear that the consequences of a Store Manager reporting that he or she spent 50% or less of his or her time on exempt job duties would be nothing more than a follow-up session to see what could be done to help the Store Manager restore his or her proper work balance or, failing that, a possible reclassification of the Store Manager as non-exempt. | Sapp Decl., Exh. B ("If you are spending the majority of your time on non-managerial duties, we want to understand the conditions in your store causing this and we will work with you to restore the proper balance of your work duties. … If the percentage of your time spent on non-managerial job duties is 50% or more, explain … the circumstances at your store that have caused this imbalance and what steps you and we can take to restore the proper balance of your job duties.  If our efforts are unsuccessful at restoring the proper work balance, Rite Aid may reconsider your exempt classification.  If you are reclassified as non-exempt, your compensation would be changed from salaried to hourly at a rate that, with anticipated overtime hours, would not be expected to result in a loss of pay."). |
| 32. Each responding Store Manager is instructed to sign the self-audit, certifying that the answers given are correct. | Sapp Decl., Exhs. C, D. |
| 33. The self-audits were answered honestly by the Store Managers who took them. | Alvarez Decl., ¶¶ 7-9; Bair Decl., ¶¶ 7-9; Barksdale Decl., ¶¶ 7-8; Battaglia Decl., ¶¶ 7-9; Brawley Decl., ¶¶ 7-9; Buchanan Decl., ¶¶ 7-9; Buckley Decl., ¶¶ 7-9; Caldwell Decl., ¶¶ 7-9; Carcamo Decl., ¶¶ 7-9; Carman Decl., ¶¶ 7-9; Castillo Decl., ¶¶ 7-9; Caswell Decl., ¶¶ 7-9; Cornelius Decl., ¶¶ 7-9; Cram Decl., ¶¶ 7-9; Cuevas Decl., ¶¶ 7-9; Davis Decl., ¶¶ 7-9; Dezylva Decl., ¶¶ 7-9; Doubleday Decl., ¶ 5; Edwards Decl., ¶¶ 7-9; Fernandez Decl., ¶¶ 7-9; Fiss Decl., ¶¶ 7-9; Gevdzhyan Decl., ¶¶ 7-9; Gomez Decl., ¶¶ 7-9; Gregory Decl., ¶¶ 7-9; Guevara Decl., ¶¶ 7-9; Hanna Decl., ¶¶ 7-9; Harris Decl., ¶¶ 7-9; |

| Fact | Evidence |
|---|---|
| | Hernandez Decl., ¶¶ 7-9; J. Hicks Decl., ¶¶ 7-9; S. Hicks Decl., ¶¶ 7-9; Horton Decl., ¶¶ 7-9; Lagimoniere Decl., ¶¶ 7-9; Latanaphakay Decl., ¶¶ 7-9; Leffew Decl., ¶¶ 7-9; Lembezeder Decl., ¶¶ 7-9; Loya Decl., ¶¶ 7-9; Lugo Decl., ¶¶ 7-9; McIntash Decl., ¶¶ 7-9; Mendez Decl., ¶¶ 7-9; Migranyan Decl., ¶ 5; R. Miller Decl., ¶¶ 7-9; S. Miller Decl., ¶¶ 7-9; Moreno Decl., ¶¶ 7-9; Mueller Decl., ¶¶ 7-9; David Nieburger ¶¶ 7-9; Randy Pawelczak ¶¶ 7-9; Pedigo Decl., ¶¶ 7-9; Perez Decl., ¶¶ 7-9; Perreira Decl., ¶¶ 7-9; Pinon Decl., ¶¶ 7-9; Porteous Decl., ¶¶ 7-9; Preston Decl., ¶¶ 7-9; Ramirez Decl., ¶¶ 7-9; Rider Decl., ¶¶ 7-9; D. Roberts Decl., ¶¶ 7-9; K. Roberts Decl., ¶¶ 7-9; Rodgers Decl., ¶¶ 7-9; Rodriguez Decl., ¶¶ 7-9; Rollins Decl., ¶¶ 7-9; Shahbazian Decl., ¶¶ 7-9; Shirey Decl., ¶¶ 7-9; Skeen Decl., ¶ 4; Smiley Decl., ¶¶ 7-9; Stanfill Decl., ¶¶ 7-9; Todd Decl., ¶¶ 7-9; Townsend Decl., ¶¶ 7-9; Truesdale Decl., ¶¶ 7-9; Vallejo Decl., ¶¶ 7-9; Van Haren Decl., ¶¶ 7-9; Vaurs Decl., ¶¶ 7-9; Velasquez Decl., ¶¶ 7-9; Venturini Decl., ¶¶ 7-9; Vivanco Decl., ¶¶ 7-8; Vlasil Decl., ¶¶ 7-9; Voeltz Decl., ¶¶ 7-9; Von Cannon Decl., ¶¶ 7-9; Warner Decl., ¶¶ 7-9; Weckiewicz Decl., ¶¶ 7-9; Whemler Decl., ¶¶ 7-9; Wilson Decl., ¶¶ 7-9; Wise Decl., ¶¶ 7-9; Zanella Decl., ¶¶ 7-9. |
| 34.  Rite Aid has obtained declarations from 82 Store Managers re-verifying the accuracy of the self-audits and the absence of any coercion by Rite Aid to answer them a certain way. | Wohl Decl., ¶¶ 2, 3.<br><br>*See* RSE 33, *supra*. |
| 35.  More than 82% of the Store Managers reported in their February 2005 self-audits that they were meeting Rite Aid's expectations and spending more than 50% of their time on managerial job duties. | Sapp Decl., ¶¶ 32, 34, Exh. C. |
| 36.  For the June 2006 self-audit, although still in progress (417 of 577 self-audits originally circulated have thus far reported), 86% of the Store Managers reporting said that they were meeting Rite Aid's expectations and spending more than 50% of their time on managerial job duties. | Sapp Decl., ¶¶ 33, 35, Exh. D. |
| 37.  To the extent that a Store Manager reported spending 50% or less of his or her time performing managerial job duties on the February 2005 self-audit, Rite Aid followed up with the Store Managers to | Sapp Decl., ¶ 36.<br><br>Barksdale Decl., ¶ 9; Vivanco Decl., ¶ 9. |

| Fact | Evidence |
|---|---|
| help him or her restore the proper work balance. | |
| 38. As it did before, Rite Aid intends to work with those Store Managers who reported spending half or less of their time on managerial job duties in the June 2006 self-audit to help restore their work balances to meet Rite Aid's expectations. | Sapp Decl., ¶ 37. |
| 39. The 1,014 self-audits (597 from February 2005 and 417 from June 2006) also reveal wide disparities in what job duties Store Managers perform and how Store Managers spend their time. | Sapp Decl., ¶ 38, Exhs. C, D. Fortenbaugh Decl., ¶ 16, 18, Exhs. C-1 to C-7, D-1 to D-7. |
| 40. The self-audits show that virtually no two Store Managers spend their time in the same fashion; in fact, of the 1,014 total, there were two identical time allocations only four times. | Fortenbaugh Decl., ¶ 16, 18, Exhs. C-1 to C-7, D-1 to D-7. |
| **LECG Observational Study** | |
| 41. In June 2006, LECG performed an observational study of Store Managers. | Fortenbaugh Decl., ¶ 3. |
| 42. In the LECG study, experts from LECG conducted week-long shadowing observations of 12 randomly-selected Store Managers. | Fortenbaugh Decl., ¶¶ 11, 12. |
| 43. Like the self-audits that Rite Aid has administered on two separate occasions, the LECG observational study showed that while Store Managers overwhelmingly spend more than 50 % of their time on exempt job duties, there are significant disparities in what job duties Store Managers perform and how they spend their time. | Fortenbaugh Decl., ¶ 18, Exhs. B-1 to B-9. |
| **Declarations from Current and Former Store Managers Submitted by Rite Aid** | |
| 44. As part of its opposition papers, Rite Aid submits declarations from 9 current Store Managers confirming that Store Managers spend more than 50 percent of their time on exempt job duties and that each Store Manager performs his or her job in a unique manner, depending on numerous factors, including which tasks are performed, store size, sales volume, and | *See* Barksdale Decl., ¶ 11; Buchanan Decl., ¶¶ 6-11; Ferguson Decl., ¶¶ 5, 8-15; Fiss Decl., ¶¶ 6-13; J. Hicks Decl., ¶¶ 6-14; Hindman Decl., ¶¶ 4, 7-11; Migranyan Decl., ¶¶ 4-5, 8-13; Mueller Decl., ¶¶ 4, 7-12; Vivanco Decl., ¶10. |

| Fact | Evidence |
|------|----------|
| | store organization. | |
| 45. | As part of its opposition papers, Rite Aid also submits declarations from three former Store Managers further confirming that Store Managers spend more than 50 percent of their time on exempt job duties and that each Store Manager performs his or her job in a unique manner. | Doubleday Decl., ¶¶ 4-5, 12; Dwillis Decl., ¶¶ 5, 14; Skeen Decl., ¶¶ 4, 11. |
| **Rite Aid's Processes** | |
| 46. | Rite Aid has adopted a number of processes for operations at our stores that can be broken up into specific activities. These processes cover such matters as merchandising (including displays and pricing), customer service, store appearance and maintenance, financials, and human resource policies and procedures. The purpose of these processes is to embody best practices on how store operations should be handled. We continually update the processes to reflect how better and more efficiently to operate the store. | Sapp Decl., ¶ 39. |
| 47. | Rite Aid strives that these processes be followed in every store, but recognizes that due to differences among stores due to such factors as size, sales volume, geographic and market location, staffing levels, skill level of the staff, managerial style and experience of the specific Store Manager, *etc.*, processes are carried out differently from store to store. | Sapp Decl., ¶ 40.<br><br>Buchanan Decl., ¶ 9 ("Even though Rite Aid has company guidelines that are used to ensure the uniformity and success of its stores, as a Store Manager, I am required to exercise my independent judgment and discretion on a daily basis. For example, because I run a store that is close to the beach, my customers are not like most other Rite Aid stores. So, I seek out items that I believe will sell well in my store due to its geographic location and customer demographic, but which may not be sold in other Rite Aid stores. …")<br><br>*See also* Buchanan Decl., ¶¶ 9-11; Doubleday Decl., ¶¶ 11-12; Dwillis Decl., ¶¶ 13-14; Ferguson Decl., ¶¶ 13-14; Fiss Decl., ¶ 6; J. Hicks Decl., ¶¶ 11-14; Hindman Decl., ¶¶ 10-11; Migranyan Decl., ¶¶ 12-13; Mueller Decl., ¶¶ 11-12; Skeen Decl., ¶¶ 10-11. |
| 48. | The completion of a Rite Aid process encompasses a variety of managerial and | Sapp Decl., ¶ 41. |

| Fact | Evidence |
|------|----------|
| non-managerial duties.  Although the process requires the performance of manual duties, the Store Manager who is responsible for the successful completion of a process has to perform the core functions of a leader.  These core functions include, but are not necessarily limited to, assessing the initial situation, coordinating and planning processes, ensuring that associates are trained, organizing associates, delegating tasks, monitoring performance, giving feedback, coaching associates if they need to perform better, modifying the process or coming up with new solutions if obstacles arise the impede progress or an unexpected development occurs, *etc.*  All of those core functions are left to the discretion and independent judgment of the Store Manager. | Ferguson Decl., ¶ 13 ("Even though Rite Aid has company guidelines that are used to ensure the uniformity and success of its stores, as a Store Manager, I am constantly required to exercise my independent judgment and discretion. For example, on a daily basis I am required to decide what tasks need to be performed by my subordinates, decide which tasks will be assigned to which subordinates, decide whether my payroll expenses are too high and someone needs to be sent home, or whether we need to call in additional staff to meet the needs of our customers, grant special requests to employees, approve vacation requests and make plans to help increase sales."). *See also* Buchanan Decl., ¶¶ 9-11; Doubleday Decl., ¶¶ 11-12; Dwillis Decl., ¶¶ 13-14; Ferguson Decl., ¶¶ 13-14; J. Hicks Decl., ¶¶ 11-14; Hindman Decl., ¶¶ 10-11; Migranyan Decl., ¶¶ 12-13; Mueller Decl., ¶¶ 11-12; Skeen Decl., ¶¶ 10-11. |
| 49.  Rite Aid processes cannot possibly account for every situation that a Store Manager might encounter during a day, such as an associate disciplinary problem, a customer complaint, a store emergency, *etc.* | Sapp Decl., ¶ 42. J. Hicks Decl., ¶ 12 ("No matter how many contingencies you program, a robot could not do my job.  There is always something new that requires my staff to come to me for my judgment…."). Hindman Decl., ¶ 10 ("[E]ven though there are company guidelines on how to deal with customers' special requests, there are always situations when I have to use my judgment as to how to handle individual situations that fall outside of the guidelines."). *See also* Buchanan Decl., ¶¶ 9-11; Doubleday Decl., ¶¶ 11-12; Dwillis Decl., ¶¶ 13-14; Ferguson Decl., ¶¶ 13-14; J. Hicks Decl., ¶¶ 11-14; Hindman Decl., ¶¶ 10-11; Migranyan Decl., ¶¶ 12-13; Mueller Decl., ¶¶ 11-12; Skeen Decl., ¶¶ 10-11. |
| **Plaintiff Prag Tierno** | |
| 50.  Plaintiff Prag Tierno was hired by Rite Aid as an assistant manager on October 28, 2002.  He was promoted to Store Manager in May 2003. | Tierno Decl., 28:4-6, 49:15-19, 52:15-19; Petit Decl., ¶ 7. |
| 51.  Plaintiff worked as a Store Manager at Rite | Tierno Depo., 52:15-19, 55:15-17; Petit Decl., ¶ 8; |

| Fact | Evidence |
|------|----------|
| | Aid's Santa Fe Springs, California store. | Toney Decl., ¶ 10. |
| 52. | John Petit was the District Manager for the Santa Fe Springs store (store 5495) while plaintiff was a Store Manager, and therefore was plaintiff's direct supervisor while he was a Store Manager at Rite Aid. | Petit Decl., ¶ 8; *see also* Tierno Depo. 53:23-54:2, 99:21-23 (Petit was plaintiff's District Manager). |
| 53. | Plaintiff admits that his job as a Store Manager required—and that he performed—several management tasks. | Tierno Depo., 83:21-25, 84:21-85:17, 86:18-89:21, 91:2-6, 105:7-106:9, 135:18-22, 136:13-17, 142:15-144:16, 148:19-22, 149:10-150:7, 153:2-175:15, 177:5-13, 180:2-6, 184:11-20, 254:3-257:13, Exhs. 4, 5. |

*E.g.,* Tierno Depo., 83:21-25:

Q.   "What was your idea [of the role the store manager was supposed to play in the store]?"

A.   "To manage the everyday operations."

Q.   "Okay.  And to manage the everyday operations meant to act as a leader, correct?"

A.   "Yes."

Tierno Depo., 88:7-89:11:

Q.   "Scheduling your associates.  Deciding who was going to work what.  Was that your job?"

A.   "Yes."

Q.   "How about doing payroll?  Wasn't that your job?"

A.   "Yes."

Q.   "How about reviewing store sales volume and goals?"

A.   "Yes."

Q.   "How about walking the floor to see how things were going?"

A.   "Yes."

Q.    "And planning and distributing work duties?"

A.   "Yes."

Q.   "Coaching associates?"

A.   "Yes." …

Q.   "Overseeing display setups?"

| Fact | Evidence |
|------|----------|
| | A.   "Yes." … |
| | Q.   "Disciplining employees if there was a problem?" |
| | A.   "Yes." |
| | Q.   "Terminating them if there was a problem?" |
| | A.   "Yes." … |
| | Q.   "So how is it that you determined whether you should do [certain tasks] yourself, personally, rather than having an associate do it?" |
| | A.   "By prioritize [*sic*]." |
| | Tierno Depo., 142:15-143:14, Exh. 4: |
| | Q.   "[Reading from plaintiff's self-assessment] 'What do you consider to be the five most important functions of your job:  One, exceed my customer service expectations; two, respect, develop, and appraise my associates and coworkers; three, successfully consistently manage, control, operate company resources; four, identify opportunities; five, deliver to my supervisors and company owners/shareholders the highest return.'  Are those all true statements as to what you considered at the time to be your five most important functions of the job?" |
| | A.   "Yes." … |
| | Q.   "[I]sn't it true that while you were a store manager at Santa Fe, you spent most of your time focused on delivering on those five functions that you just listed there?" |
| | A.   "Yes." |
| 54.   Plaintiff contends that while he worked as a Store Manager at Rite Aid, he spent less than half of his time on exempt job duties. | Tierno Depo., 107:19-23, 113:18-118:15, 132:2-133:22, Exh. 3 (by his math, claiming that only 37% of 302% of his time was spent on managerial tasks). |
| 55.   However, plaintiff's District Manager, John Petit, always believed that plaintiff was spending more than half of his time on exempt job duties, and assessed his performance on that basis. | Petit Decl., ¶ 12. |
| 56.   In spring 2004, as part of the annual | Petit Decl., ¶¶ 9, 10, Exhs. A, B. |

| Fact | Evidence |
|------|----------|
| performance review process, plaintiff was asked to and did complete a Self-Appraisal Form for Salary Associates.  Petit also filled out a Performance Appraisal Form for plaintiff and reviewed it with him. | |
| 57.  On October 27, 2004, Petit visited plaintiff's store and observed several conditions within the store which he viewed as unacceptable.  On that same date, Petit prepared a written warning to plaintiff which outlined these conditions and notified plaintiff that each of the conditions were required to be brought up to standard or else disciplinary action would be a consequence.  Petit also sat down with plaintiff to review the written warning and discuss his expectations with regard to remedying the unacceptable conditions. | Petit Decl., ¶ 11, Exh. C. |
| 58.  Plaintiff was terminated on December 10, 2004, for violation of company policy.  Specifically, plaintiff was terminated for taking excessive markdowns on glucose meters to a reseller.  Initially, plaintiff justified his discounted sales of the glucose meters based on a manufacturer's coupon.  Petit specifically instructed plaintiff to discontinue doing so.  Rather than follow Petit's instruction, plaintiff continued selling the glucose meters to the reseller at a discount, but rather than justifying the discount based on coupons, plaintiff instead inputted the sales into the register as a "form 30 markdown," which involves marking down the product as a direct negative to the store.  On this basis, plaintiff continued to sell several hundred of the glucose meters to the reseller, which resulted in a loss of over $25,000 in gross profit to Rite Aid.  Based on this gross misconduct, plaintiff's employment was terminated. | Petit Decl., ¶ 13; Toney Decl., ¶ 11. |
| 59.  In plaintiff's deposition, conducted on January 17, 2006, plaintiff responded to no less than 212 questions with the response of "don't know" or "don't recall"— including to questions as basic as when he got married, where and when he went to school and what degrees he received, and any details (dates, job titles, duties) of his | Wohl Decl., ¶ 4, Exh. C—"Don't recall"/"Don't know" testimony:  Tierno Depo. 7:5-14, 8:25-9:9, 17:12-20, 18:9-10, 18:19-20, 19:2-5, 19:19-20, 20:10-13, 20:22-24, 23:24-24:1, 24:15-17, 24:25-25:10, 27:10-18: 27:25-28:2, 28:22-29:15, 29:10-15, 30:5-15, 31:23-24, 32:4-11, 33:1-2, 33:10-17, 35:15-36:14, 40:17-41:18, 42:1-2, 43:3-44:20, 46:3-13, 49:8-14, 50:10-19, 51:10-12, 51:22-24, |

| Fact | Evidence |
|---|---|
| pre- and post-Rite Aid employment.  In contrast, plaintiff testified with specificity to all details related to the exact percentages of time he spent on various managerial and non-managerial functions and how many hours he worked as a Store Manager. | 52:5-53:5, 53:18-22, 54:6-8, 54:14-25, 56:21-23, 57:4-6, 66:15-17, 67:7-9, 71:21-23, 77:10-11, 78:9-13, 79:1-4, 82:3-6, 83:15-18, 85:12-14, 91:7-18, 91:25-92:10, 93:7-16, 94:7-10, 95:7-14, 99:12-16, 101:17-25, 102:9-12, 129:7-12, 134:13-19, 135:13-17, 136:8-10, 136:20-137:6, 138:15-25, 140:3-4, 140:24-141:2, 140:24-25, 141:13-14, 146:19-22, 147:16-18, 148:23-149:4, 158:24-159:1, 160:8-10, 171:16-172:1, 176:15-19, 177:1-4, 181:17-18, 183:3-5, 185:2-11, 186:2-8, 191:1-5, 194:5-13, 195:25-196:3, 196:12-25, 197:21-23, 199:12-14, 202:3-4, 203:2-6, 204:12-13, 205:7-9, 205:21-23, 206:15-25, 208:13-16, 209:15-23, 212:21-23, 213:7-8, 213:16-18, 213:25-214:1, 214:10-12, 223:13-14, 231:16-17, 234:5-10, 235:10-17, 236:17-19, 236:25-237:15, 240:23-241:1, 241:17-20, 242:7-11, 243:24-25, 244:8-17, 245:3-22, 247:18-22, 248:4-7, 249:5-11, 251:5-9, 253:17-254:2, 257:8-258:3); contrasting specific testimony at Tierno Depo., 107:19-23, 113:18-118:15, 123:18-20, 132:2-133:22, 231:10-14, 232:4-7.<br><br>*E.g.*, Tierno Depo., 19:19-20:24:<br><br>Q. "[W]hen were [you and your current wife] married?"<br><br>A. "I don't recall." …<br><br>Q. "How many other marriages?"<br><br>A. "One."<br><br>Q. "And when did that take place?"<br><br>A. "I don't recall." …<br><br>Q. "When did that marriage end, do you know that?"<br><br>A. "I don't recall."<br><br>Tierno Depo., 28:22-29:15:<br><br>Q. "What year did you graduate?"<br><br>A. "Don't recall."<br><br>Q. "Well, did you graduate at age 18?"<br><br>A. "Don't recall."<br><br>Q. "Around age 18?"<br><br>A. "Don't recall." …<br><br>Q. "How long did you attend technical college?" |

| Fact | Evidence |
|---|---|
| | A. "I don't recall." |
| | Q. "Where was that located?" |
| | A. "Mexico." |
| | Q. "Where in Mexico?" |
| | A. "I don't recall." |
| | |
| | Tierno Depo., 34:6-11: |
| | Q. "Where was your first job?" |
| | A. "I don't recall." |
| | Q. "Do you recall anything about your first job?" |
| | A. "No." |
| | Q. "Do you recall your second job?" |
| | A. "No." |
| | |
| | Tierno Depo., 41:4-18: |
| | Q. "[D]o you know whether you were classified as exempt or not exempt from overtime in either of [your two job positions at pre-Rite Aid employer]?" |
| | A. "Don't recall." |
| | Q. "So you know if you were paid or not paid overtime while you worked on those two jobs?" |
| | A. "Don't recall." |
| | Q. "Why did you leave [the company]?" |
| | A. "Don't recall." |
| | Q. "Who did you report to while you worked at [the company]?" |
| | A. "Don't recall." |
| | Q. "Okay.  Do you recall your next job after [that company]?" |
| | A. "Don't recall." |
| 60.   In plaintiff's deposition, he was asked to break down his time in percentages among a list of 15 specified categories of tasks typically performed by Store Managers Rite Aid (including an "other" category to cover tasks which may not have been included in the other 14 categories).  He was instructed that the total amount of time | Wohl Decl., ¶ 5, Exh. C (Tierno Depo. 107:19-23, 113:18-118:15, 132:2-133:22, Exh. 3). |

| Fact | Evidence |
|---|---|
| should equal 100%.  Plaintiff refused to follow this instruction and instead gave percentages totaling 302%.  37% of the 302% was allocated to exempt tasks. | |
| 61. In plaintiff's February 2005 job application for post-termination employment at PetSmart (his current employer), plaintiff made several statements that are false and/or contradict his sworn deposition testimony:<br><br>▪ he was employed by Rite Aid from 2001 to 2004 (in fact, he was not hired until October 2002);<br><br>▪ he had never been discharged from any prior employment (in fact, he was fired by Rite Aid for sales fraud);<br><br>▪ his supervisor at Rite Aid was Roger Ceballos (Ceballos was a Human Resources Manager; plaintiff's supervisor at Rite Aid was District Manager John Petit);<br><br>▪ if his supervisor rated his work, it would be "excellent" (Petit sharply criticized plaintiff's job performance and ultimately fired him for sales fraud);<br><br>▪ his duties as a store manager at Rite Aid were to "oversee all store operations" (plaintiff alleges that he spent most of his time on menial tasks); and<br><br>▪ he worked "45/50" hours per week at Rite Aid (plaintiff alleges that he worked 65 hours per week at Rite Aid). | Wohl Decl., ¶¶ 6-8, Exh. D.<br><br>*See* contradicting deposition testimony at:<br><br>▪ Tierno Depo. 28:4-6 (started at Rite Aid in October 2002); *see also* Petit Decl., ¶ 7;<br><br>▪ Tierno Depo. 24:20-22, 55:15-17, 95:16-18, 176:23-25, 207:1-4 (admitting terminated from Rite Aid); *see also* Petit Decl., ¶ 13; Toney Decl., ¶ 11;<br><br>▪ Tierno Depo. 53:23-54:2, 99:21-23 (Petit was his District Manager); *see also* Petit Decl., ¶ 8;<br><br>▪ Tierno Depo. 194:23-206:25, Exh. 7 (admitting Petit wrote him up for unacceptable store conditions); *see also* Petit Decl., ¶¶ 11, 13, Exh. C;<br><br>▪ *see* RSE 54, *supra* (claiming he spent only a very minimal percentage of his time on management functions); and<br><br>▪ Tierno Depo. 123:18-20, 231:10-14, 232:4-7 (repeatedly stating he worked an average of 65 hours per week). |