# EXHIBIT A-2

## APPENDIX A

Order Granting Class Certification, *Prag Tierno, individually and on behalf of all others similarly situated, Plaintiff v. Rite Aid Corporation, Defendant*, U.S.D.C., N.D. Cal., No. C-05-02520-TEH (Aug. 31, 2006)

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

PRAG TIERNO, individually and on behalf
of all others similarly situated,

    Plaintiff,

  v.

RITE AID CORPORATION,

    Defendant.

No. C 05-02520 TEH

**ORDER GRANTING MOTION FOR
CLASS CERTIFICATION**

   This matter came before the Court on August 14, 2006, on Plaintiff's motion for
class certification pursuant to Federal Rule of Civil Procedure 23. Having carefully
considered the parties' written and oral arguments, and the extensive record herein, the
Court finds that Plaintiff has satisfied the prerequisites of Rule 23(a) and that this action
is maintainable as a class under Rule 23(b)(3) for the reasons set forth below.

## A. BACKGROUND

   Plaintiff, Prag Tierno, is a former Store Manager for Rite Aid, a national
drugstore chain that operates about 590 stores in California. Plaintiff contends that Rite
Aid's treatment of Store Managers in California violates California Labor Laws.
Specifically, Plaintiff alleges that, despite their job title, Rite Aid Store Managers do not
in fact spend more than 50 percent of their time on discretionary manager functions, and

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

thus do not meet the criteria for being classified as "exempt" management employees under California law. Plaintiff further alleges that Rite Aid nonetheless knowingly misclassifies all of its California Store Managers as "exempt" management employees. As a result of this practice, Plaintiff asserts, Rite Aid obtains an unfair competitive advantage and improperly denies its Store Managers overtime pay and other benefits, such as meal and rest periods, to which they are entitled under the California Labor Code.[1]

Plaintiff's complaint, originally filed in state court and removed to this Court pursuant to the Class Action Fairness Act, § 28 U.S.C. §§ 1332(d), 1441(b), seeks damages, penalties, restitution, and injunctive relief pursuant to the Unfair Business Practices Act, Calif. Bus. & Prof. Code § § 17200 *et seq.*, and California Labor Code §§ 226, 226.7, 510, and 512. By this motion, Plaintiff seeks approval under Fed. R. Civ. P. 23 to pursue this action on behalf of the following class:

> all persons employed as Store Managers in any of Rite Aid
> Corporation's California retail drugstores at any time
> between May 9, 2001 and the present.

*See* Pl.'s Mot. at 11.

Plaintiff asserts that he meets the prerequisites of Fed. R. Civ. P. 23(a), and that certification is appropriate under either Fed. R. Civ. P. 23(b)(1), (2) or (b)(3). Rite Aid argues that Plaintiff cannot satisfy the prerequisites of Rule 23(a) because Plaintiff's claims are not typical of the class and Plaintiff is an inadequate class representative. Rite Aid further contends that certification is not appropriate under any subdivision of 23(b),

---

[1] California Labor Code § 510(a) requires employers to pay overtime for any work over eight hours in one workday, over 40 hours in one workweek, or on the seventh day of work in one workweek, subject to certain exemptions. One such exemption is for "executive, administrative, and professional employees" who are "primarily," i.e. more than 50 percent, engaged in managerial duties, and are customarily and regularly exercising discretion and independent judgment in performing those duties. *See* California Labor Code § 515(a),(e); California Industrial Welfare Commission ("IWC") Wage Order 7-2001. California law also requires that employers provide their non-exempt employees with 30-minute meal periods and rest breaks, and accurate itemized wage and hour statements. Calif. Labor Code §§ 226(a), 512(a).

2

United States District Court

For the Northern District of California

1  primarily because individual issues would predominate and make the class
2  unmanageable.

3     The Court considers each of the Rule 23 requirements in turn. In so doing, the
4  Court is mindful that that it must conduct a "'rigorous analysis'" of the prerequisites of
5  Rule 23. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (citation omitted),
6  *amended* 273 F.3d 1266 (9th Cir. 2001). At the same time, however, motions for class
7  certification should not become occasions for examining the merits of the case. *Caridad*
8  *v. Metro-North Commuter Railroad*, 191 F.3d 283, 293 (2nd Cir. 1999); *Cornn v.*
9  *United Parcel Service, Inc.,* 2005 WL 588431 *6 (N.D. Cal.) ("[A]lthough the court is
10 'at liberty' to consider evidence that relates to the merits if such evidence also goes to
11 the requirements of Rule 23 . . . the court may not consider whether the party seeking
12 class certification . . . is likely to prevail on the merits") (citations omitted).

13

14 B. PREREQUISITES OF FED. R. CIV. P. 23(A)

15    In order to obtain certification under Rule 23, Plaintiff must first demonstrate that
16 the four prerequisites of Rule 23(a)(1)-(4) are met: numerosity, commonality, typicality,
17 and adequacy of representation. Each is discussed in turn.

18    1. Numerosity

19    Rite Aid does not dispute that this first prerequisite is satisfied. Each of the
20 roughly 590 retail stores in California is overseen by one Store Manager. In addition,
21 there has been turnover in the Store Manager Positions since the inception of the
22 proposed class period (May 9, 2001). Thus, according to Rite Aid, the class would likely
23 number roughly 1,100 individuals, *see* Sapp Decl. at ¶ 11, which readily satisfies the
24 numerosity requirement. *Staton v. Boeing Co.,* 327 F.3d 938, 953 (9th Cir. 2003) (class
25 must be 'so numerous that joinder of all members is impracticable.'") (citation omitted).

26    2. Commonality

27    Under this second prerequisite, common questions of law or fact must exist
28 among class members. The showing needed to satisfy commonality is "minimal,"

3

*Hanlon. v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), and Rite Aid does not dispute that it is satisfied in this case. Indeed, taking the allegations of the complaint as true, it is apparent that common questions of law and fact are present, including, but not limited to, whether Rite Aid improperly classified all Store Managers as exempt employees, and if so, whether such classification was done knowingly; whether Rite Aid violated various provisions of the California Labor Code; whether all Store Managers are required to perform similar duties in a similar manner, and Rite Aid's realistic expectations regarding the position. *See e.g. Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 487 (E.D. Cal. 2006).

### 3. Typicality

While typicality and commonality "tend to merge," *see Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157, n.13 (1982), typicality focuses on whether the named plaintiffs possess the "same interest and suffer the same injury" as class members. *Id.* at 156. The requirement is satisfied if the named plaintiff's claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon,* 150 F.3d at 1020. Here, Plaintiff's claims are either identical to or substantially the same as those alleged on behalf of class members (depending on whether the class member is a current or former employee).

Rite Aid contends that Plaintiff's claims are not typical of the class because there is no "typical" store or any "typical" class member. This argument is misplaced, however, because it goes to the issue of whether there is sufficient similarity among the Store Managers to create common questions or whether each Store Manager position is sufficiently unique to defeat common questions. Thus, this objection does not go to the issue of whether Plaintiff's claims are typical of those *alleged* by the class.

Rite Aid also argues that Plaintiff is not a "typical" class member because he alleges that he spent less than 50 percent of his time on non-exempt tasks whereas self-audits undertaken by the Store Managers in 2005 and 2006 showed that only a minority

4

of the Store Managers (17.6% in 2005 and 14% in 2006 respectively) spent less than 50 percent of their time on non-exempt tasks. As this argument goes entirely to the merits it is not an appropriate basis for challenging Plaintiff's typicality. Accordingly, the Court finds that this prerequisite of Rule 23(a) is satisfied.

### 4. Adequacy of Representation

Finally, Rule 23(a)(4) requires that (1) the proposed class representatives do not have conflicts of interest with the proposed class, and (2) that the class representatives are represented by qualified counsel. *Hanlon*, 150 F.3d at 1020. The underlying purpose of these requirements are to protect the due process interests of absent class members who "must be afforded adequate representation before entry of a judgment which binds them." *Wang v. Chinese Daily News, Inc.*, 231 F.R.D 602, 609 (C.D. Cal. 2005).

There is no indication that Plaintiff has any conflicts with the interests of the proposed class and Rite Aid does not identify any. Rite Aid does, however, contend that Plaintiff is an inappropriate class representative because he has demonstrated a pattern of dishonesty and inconsistency and thus is not a trustworthy or credible class representative. *See Savino v. Computer Credit, Inc.* 164 F.3d 81, 87 (2nd Cir. 1998) (district court did not abuse discretion in denying class certification when the plaintiff's differing accounts about letters that formed the very basis of the lawsuit created serious concerns regarding his credibility at any trial).

Rite Aid first argues that, at his deposition, Plaintiff provided details in response to questions on certain matters but failed to cooperate in answering other questions. The Court has seen very few deposition transcripts in which opposing counsel could not make this complaint. The Court is not persuaded that this is grounds for finding Plaintiff to be an inadequate class representative in this case. Rite Aid also contends that Plaintiff was terminated from his employment at Rite Aid because he continued to sell glucose meters to a reseller at discount after being told not to by his District Manager, resulting in a loss of over $25,000 in gross profit to Rite Aid. *See* Petit Decl. ¶ 13, Toney Decl.

United States District Court
For the Northern District of California

1  ¶ 11.  Plaintiff responds that he was not given a reason for his termination, that he was

2  only told "[w]e're gonna let you go," and that he first heard that Rite Aid had terminated

3  him because of the glucose meter discounts when Rite Aid contested his request for

4  unemployment benefits. Cole Reply Decl., Ex. B at 221-22 (Tierno Dep.).  The record on

5  this point is inadequate to show that the Plaintiff engaged in any dishonesty or should

6  otherwise be disqualified as a class representative.

7        Finally, Rite Aid contends that Plaintiff made misleading or inconsistent

8  statements on a job application form he filled out for his post-Rite Aid employer

9  (PetSmart). For example, Rite Aid states that Plaintiff represented on his application

10  that, as a Store Manager at Rite Aid it was his duty to "oversee all store operations"

11  whereas now Plaintiff claims that his duties are mostly non-management tasks.  Plaintiff,

12  however, has never disputed that it was his duty to oversee store operations; the issue is

13  whether the duties involved in this oversight involved more than 50 percent exempt

14  managerial duties. Rite Aid also complains that Plaintiff overstated his performance

15  evaluations, identified a Human Resources Manager as his supervisor instead of his

16  District Manager, and failed to disclose that he had been "discharged" from Rite Aid.

17  None of these points is sufficient to cause the Court conclude that Plaintiff's credibility

18  has been so undermined as to render him unfit to represent the class. *See Dubin v.*

19  *Miller*, 132 F.R.D 269, 272 (D.Colo. 1990) ("For an assault on the class representative's

20  credibility to succeed, [the defendant] must demonstrate that there exists admissible

21  evidence so severely undermining plaintiff's credibility that a fact finder might

22  reasonably focus on plaintiff's credibility, to the detriment of the absent class members'

23  claims").  This Court, however, carefully monitors the integrity of any class

24  representative, and if serious concerns develop as this case moves forward, the Court can

25  revisit this issue. *See Barefield v. Chevron, U.S.A., Inc.,* 1988 WL 188433 *2 (N.D. Cal.

26  1988) (class certification orders are "inherently tentative and may be modified as

27  circumstances require").

28

**United States District Court**
For the Northern District of California

Turning to the qualifications of counsel, the Court has reviewed the information supplied and concludes that counsel for Plaintiff have shown that they have the requisite experience to prosecute this action. *See* Cole Decl., Ex. M. Counsel have also exhibited knowledge of the applicable law and appears prepared to commit the resources necessary to represent the class. *See* Fed. R. Civ. P. 23(g). Rite Aid does not question the qualifications or adequacy of Plaintiff's counsel. Accordingly, the Court concludes that this final prerequisite of Rule 23(a) is satisfied.

C. PREREQUISITES OF FED. R. CIV. P. 23(B)(3)

In addition to meeting the prerequisites of Rule 23(a), Plaintiff must satisfy the Court that the action can be appropriately certified under either 23(b)(1), (b)(2), or (b)(3). Because the Court finds that this action is maintainable under subsection (b)(3), the Court does not reach Plaintiff's contention that certification is also proper under (b)(1) and (b)(2).[2] Subsection (b)(3) applies if (1) common questions "predominate over any questions affecting only individual members," and (2) the class action is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Each requirement is discussed in turn.

1. Whether Common Questions Predominate

Since common issues of law or fact must already be established under Rule 23(a), a showing of commonality, alone, is not sufficient to satisfy this requirement. Indeed, as this Court has previously noted, the primary question in "many class actions is not whether common issues exist but whether common issues *predominate*." *See Cornn*, 2005 WL 588431 *7 (emphasis added). "Because no precise test can determine whether common issues predominate, the Court must pragmatically assess the entire action and

_____

[2]Subsection (b)(1) applies where there is a risk of inconsistent or unfair adjudication if the class is not certified. Subsection (b)(2) applies where the defendant "has acted or refused to act on grounds generally applicable to the class" making injunctive and declaratory relief appropriate with respect to the class as a whole.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    the issues involved." *Romero*, 235 F.R.D. at 489 (citing *Rodriguez v. Carlson*, 166

2    F.R.D. 465, 477 (E.D. Wash. 1996). If the common questions "'present a significant

3    aspect of the case and they can be resolved for all members of the class in a single

4    adjudication, there is clear justification for handling the dispute on a representative rather

5    than on an individual basis '" *Hanlon,* 150 F.3d at 1022 (citation omitted).

6       Plaintiff contends that common questions will predominate in this case because

7    Rite Aid's highly standardized chain store operation is designed to ensure that all Store

8    Managers perform the same or substantially similar tasks in a similar manner. As a

9    result, Plaintiff argues, common questions regarding the seminal issue – whether Rite

10    Aid has improperly classified all Store Managers as exempt employees – will

11    predominate over individual issues in the case. In support of this position, Plaintiff relies

12    on the following.

13       First, Plaintiff presents evidence that, as a general matter, Rite Aid exercises a

14    great deal of centralized control over its stores (consistent with a chain store model) with

15    respect to just about every aspect of store operations – from store appearance, layout,

16    merchandising, pricing, staffing, budgeting, and personnel policies to the music played

17    and the temperature at each store. As Rite Aid's Director of Human Resources and

18    Labor Relations for the West Coast, Brad Sapp, explains, "Rite Aid has adopted a

19    number of processes . . . [that] cover such matters as merchandising (including displays

20    and pricing), customer service, store appearance and maintenance, financials, and human

21    resource policies and procedures . . . [and] Rite Aid strives that these processes be

22    followed in every store." Sapp Decl. at ¶ ¶ 39-40. This evidence is essentially

23    undisputed.

24       Second, Plaintiff presents evidence that this culture of centralized control and

25    standardization of stores extends to the position of Store Manager. Each Rite Aid retail

26    drug store in California contains the same job categories and hierarchy, culminating in

27    the Store Manager position which pays on average $52,500 (with bonus eligibility), *see*

28    Sapp Decl. at ¶ 14, and is typically filled by promotion from within the company. Every

United States District Court

For the Northern District of California

1   Store Manager undergoes the same in-depth, roughly nine-week, Management

2   Development Program ("MDP") training course, including on-the-job training. *See* Sapp

3   Decl. ¶¶ 17-18.[3]

4       Rite Aid's Regional Vice President, James Toney, Jr., confirms that this uniform

5   training program is "the same from Store Manager to Store Manager" although some

6   Store Managers may get some additional training in a specialized department (for

7   example if a store in a rural area has a plant department). Cole Decl. Ex. E at 56-58

8   (Toney, Jr. Dep.). Similarly, Mr. Sapp confirms that MDP training is the same for "all

9   Store Managers across the board." Ex. G at 90-91 (Sapp Dep.). As part of this training,

10  Store Managers receive over 2,000 pages in uniform training materials that cover every

11  aspect of store operations. *See e.g.* Cole Decl., Ex. C at 144-46 (Petit Dep.), Ex. D at 73-

12  74, 77, 82-83, 87 (Fairman Dep.), Ex. G at 91 (Sapp Dep.), Ex. J (Operations Manual).

13  All Store Managers must adhere to the operations manual equally. Cole Decl., Ex. C at

14  75 (Petit Dep); *see also id.* at 74 ("each store manager [must] . . . follow the same

15  policies and procedures").

16      Third, Plaintiff presents evidence that Store Managers perform essentially the

17  same tasks at each store, although the scope and scale of tasks may vary somewhat due

18  to factors such as store size or location. For example, a store near the beach will, as Rite

19  Aid points out, sell a slightly different mix of products than a store inland. *See e.g.* Sapp

20  Decl. at ¶ 16; Def.'s Summary of Evid. ¶ 47, Buchanan Decl. ¶ 9.[4] Or a Store Manager

21  at an urban store may face higher turnover and thus hire more frequently than a rural

---

23     [3] Actual length of the course may vary from eight to ten weeks depending on
how quickly the attendee grasps the materials and scheduling issues that may arise
24  during the holiday seasons or to accommodate trainer vacation schedules. Sapp Decl.
at ¶ 17.

25     [4] Store Manager Robert Buchanan explains as follows: "Even though Rite Aid
has company guidelines that are used to ensure the uniformity and success of its
26  stores, as a Store Manager, I am required to exercise my independent judgment and
discretion on a daily basis. For example, because I run a store that is close to the
27  beach, my customers are not like most other Rite Aid stores. So, I seek out items that
I believe will sell well in my store due to its geographic location and customer
28  demographic, but which may not be sold in other Rite Aid stores . . ." *See* Buchanan
Decl., ¶ 9.

9

1    counterpart. Toney, Jr. Decl. at ¶ 8. The evidence does not indicate, however, that these

2    types of variations render the Store Manager positions different from each other in any

3    fundamental way. While stores may carry slightly different products, all Store Managers

4    share the common task of stocking products appropriate to their store. Similarly, Store

5    Managers in every locale share the task of staffing in-store positions. As Rite Aid

6    District Manager John Petit testified, "Store Manager duties in all the locations are –

7    they will not change as it relates to geographic location or volume." Cole Decl., Ex. C at

8    151 (Petit Dep.). Similarly, in discussing the Store Managers at two different locations,

9    Rite Aid District Manager Spencer Wells explains that they would not have received

10   different training because "[b]asically [it's] the same job, just in a different scale." Cole

11   Decl., Ex. F at 131 (Wells Dep.). Further, no matter the store, each Store Manager is

12   expected to follow and use  the same policies and procedures including the "StaffWorks"

13   program which projects sales for each store, daily staffing needs, and Store Manager's

14   tasks on a daily basis. *See* Cole Decl., Ex. D  at 64 (Fairman Dep.); *see also id.* at Ex. C

15   at 71 (Petit Dep.) (each Store Manager must comply with a checklist prepared by the

16   company that sets forth a list of items that need to be completed each day.). Each Store

17   Manager also has (and signs) an "employee atlas" which outlines "what the expectations

18   are." Cole Decl., Ex. E at 50 (Toney Jr. Dep.).

19        Fourth, Plaintiff presents evidence that Rite Aid fosters homogeneity in the Store

20   Manager's job duties, and the manner in which they are performed, by utilizing a system

21   of close supervision by District Managers, *see e.g.* Cole Decl. Ex. C at 25-26, 55-56,

22   148-49  (Petit Dep.), Exh F at 16-17, 57, 67-68  (Wells Dep.), who check that Store

23   Managers are adhering to company-wide policies and standards through store visits,

24   phone calls, emails, and remote computer monitoring of store activity.

25        Finally, Plaintiff presents evidence that Rite Aid's practices regarding transfers

26   indicates that the Store Manager job does not vary significantly from store to store.

27   Specifically, Plaintiff presents evidence that while Store Managers are transferred from

28   store to store on occasion, *see* Cole Decl. Ex. E at 53 (Toney, Jr. Dep.), Ex. G. at 80-81

United States District Court

For the Northern District of California

1 (Sapp Dep), retraining as to Store Manager duties is not generally required. Cole Decl.

2 Ex. F at 45 (Wells Dep.) (Q: Each time you transferred from store to store back when

3 you were a store manager, did you have to be retrained in some way?" A: "As a store

4 manager, no."). Retraining would be provided, however, in situations in which a Store

5 Manager was not performing well and was therefore being transferred to a less

6 challenging store. Cole Decl. Ex. E at 53 (Toney Jr. Dep.). If a new store had different

7 departments, such as fabric, the Store Manager would get instruction in how to

8 merchandise the new department. Cole Decl. Ex. F at 49 (Wells Dep.).

9        In response to the above, Rite Aid makes a multi-prong attack. For the reasons

10 explained, below, however, the Court finds that it fails to undermine Plaintiff's showing

11 that the proposed Store Manager class is "'sufficiently cohesive to warrant adjudication

12 by representation.'" *Hanlon*, 150 F.3d at 1022 (citation omitted).

13        First, Rite Aid relies upon two self audits that Rite Aid gave to its Store Managers

14 in February 2005 and June 2006 "to determine whether California Store Managers in

15 fact spend more than 50% of their time on managerial duties." Sapp Decl. at ¶¶ 27-28,

16 32-33. The audit lists eight tasks which it designates as "management" tasks, followed

17 by another eight tasks which it designates as "non-management" tasks and asks each

18 Store Manager to report the average percentage of time spent on each task, with a total

19 percentage adding up to 100%. *Id.* at ¶ 30; Def.'s Compilation of Exhibits, Tabs 11A-B.

20 According to the 2005 audit, 82.4% of Store Managers spent more than 50 percent of

21 their time on exempt, management duties; the figure for the 2006 audit is 86%. In June

22 2006, Rite Aid also hired an "expert services firm," LECG, LLC to shadow 12 randomly

23 selected Store Managers and evaluate how they spent their time. Fortenbaugh Decl. at

24 ¶ 3. The LECG firm reported that 11 of the 12 Store Managers spend most of their time

25 on exempt functions. *Id.* at ¶¶ 3, 11-12, 18.

26        As an initial matter, the Court notes that Rite Aid's invocation of the audits and

27 the LECG report to argue the ultimate issue in this case is misguided since a class

28 certification motion is not an occasion to "advance [to] a decision on the merits." *Moore*

11

1   *v. Hughes Helicaopters, Inc.*, 708 F.2d 475, 480 (9th Cir. 1983). Rite Aid's repeated

2   efforts to argue the merits of the case is merely an unwelcome distraction from the issues

3   raised by this motion.

4          Rite Aid also relies upon the audits and LECG report for a more relevant purpose,

5   however: to support its position that "there is so much variation in the work duties [Store

6   Managers] perform and how they spend their time that a determination of their exempt

7   status can only be made on an individualized, and not a classwide basis." Def.'s Opp. at

8   1. Specifically, Rite Aid argues that the audits and LECG report demonstrate that the

9   Store Manager position varies widely from store to store. The Court finds this argument

10  unpersuasive for two reasons.

11         First, the February 2005 and June 2006 audits, designed and given by Rite Aid in

12  consultation with counsel, are clearly a litigation-driven product. *See* Aug. 14, 2006 Tr.

13  at 22 (confirming that counsel for Rite Aid "certainly consulted with Rite Aid about the

14  self audit process"). Rite Aid had never previously audited the Store Manager position

15  or otherwise undertaken any analysis of the Store Manager position for purposes of

16  determining its proper classification under the California Labor Code.   The 2005 audit

17  was undertaken after Rite Aid became aware of Plaintiff's pre-suit investigation and the

18  June 2006 audit was undertaken shortly after Plaintiff filed the instant motion for class

19  certification. Similarly, the LECG report was commissioned shortly after Plaintiff filed

20  the instant motion.  Plaintiff never had an opportunity to examine LECG regarding its

21  qualifications, methodology, and basis for its conclusions. Nor is it apparent on its face

22  as to why certain tasks were categorized in certain ways. Courts often discount the value

23  of litigation-driven audits or surveys in which counsel play a role as inherently biased,

24  and often refuse to allow experts to rely upon them in rendering opinions. *See e.g., Duke*

25

26

27

28

12

1  *v. Wal-Mart*, 222 F.R.D. 189, 197 (N.D. Cal. 2004) and cases cited therein. The

2  neutrality of the two self audits and the LECG study is thus inherently suspect.[5]

3      Even putting aside the above concerns, however, the Rite Aid audits and LECG

4  study do not provide persuasive evidence of the tremendous variation among Store

5  Managers that Rite Aid argues exists. First, the audit requires that each employee divide

6  his or her time among 16 specified tasks, with the total amount of time equaling 100%.

7  As such, Rite Aid has implicitly conceded that a single set of tasks is applicable to all

8  Store Managers. Second, while Rite Aid argues that the data shows tremendous variety

9  in the time spent on each of those 16 tasks, the LECG Observational Study Percent

10  Breakdown by Work Category, *see* Fortenbaugh Decl., Exh. B2, shows that 11 of the 12

11  shadowed Store Managers followed the same general pattern of activity. Third, the

12  relevant issue is whether Store Managers spend more than 50 percent of their time on

13  managerial duties – not whether each store manager spends the exact same amount of

14  time on each of the 16 tasks that Rite Aid chose to identify in its audit.

15      In addition to the two audits and the LECG survey, Rite Aid also submits

16  declarations from nine present and three former Store Managers supporting its position

17  that each Store Manager performs his or her job in a "unique manner," depending on

18  numerous factors, including "which tasks are performed, store size, sales volume,

19  staffing levels, staff competency, customer base, and store organization." *See* Def.'s

20  Opp. at 8; *see also* Def.'s Summary of Evidence at ¶ ¶ 44-45 and  Barksdale Decl., ¶ 11,

21  Buchanan Decl., ¶ ¶ 6-11; Fiss Decl., ¶ 6-13.

22      As discussed earlier, the Court does not doubt that various factors, such as the

23  size of a store or its location, may lead to variations in the merchandise stocked, the

24  number of store staff, the volume of sales and the like. The Court is not persuaded,

25

26      [5] It is notable, for example, that the audit form requires the Store Manager to check a box at the end of the audit if the Store Manager has indicated that he or she spends more than 50% of his or her time on non-managerial tasks, in which case the

27  employee must fill out additional sections explaining (1) why this occurred and (2) how it can be corrected to "restore the proper balance." The above approach sends a

28  clear signal to the employee regarding the employer's desired audit result. *See*  Def.'s Compilation of Exhibits, Tabs 11A-B.

13

however, that these types of variations result in fundamental difference in the overall responsibilities and tasks of the Store Manager position itself. Rather, Rite Aid's senior level managers have discounted the suggestion that the Store Manager position varies in any substantial way depending on store size, location or variance in product lines. *See e.g.* Cole Decl., Ex. C at 151 (Petit Dep.) ("Store Manager duties in all the locations are – they will not change as it relates to geographic location or volume"), Ex. G at 90 (Sapp Dep.) (broad categories of duties would not change between store managers based on product lines or product mix variances). Given this testimony, and all the other evidence presented by Plaintiff, the Court is not persuaded that the declarations from the 12 individual Store Managers demonstrate that the basic question – of whether Rite Aid Store Managers spend more than 50 percent of their time on managerial duties – is too individualized to permit common questions to predominate.[6]

Furthermore, as Plaintiff points out, Rite Aid has had sufficient confidence that all Store Manager jobs are sufficiently similar that it has historically treated all Store Managers as one homogenous group for purposes of the California Labor Code. Thus it has always categorically classified all Store Managers as exempt employees without exception and without regard to store size, location, sales levels, staffing levels or customer base, and without making any individualized assessments to account for potential variation between individual Store Managers. Given this, Rite-Aid's contention that each Store Manager position must now be individually assessed to determine whether the position can be categorized as exempt or non-exempt rings hollow. *See also Wang*, 231 F.R.D at 614 ("Defendant cannot, on the one hand, argue that all [of the employees in the position at issue] are exempt from overtime wages and, on the other hand, argue that the Court must inquire into the job duties of each [class member] in order to determine whether that individual is exempt.")

_____

[6] The Court also notes that should a more developed record later demonstrate that certain categories of stores (*e.g.* urban stores or very large stores) does in fact fundamentally change the nature of the Store Manager position, the Court can always consider the propriety of subclasses to address this situation. *See Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319, 344 (2004) (Brown, J. concurring).

14

United States District Court
For the Northern District of California

1        Finally, Rite Aid argues that, as a legal matter, individual questions will

2 necessarily predominate in this case under the legal framework set forth in *Ramirez v.*

3 *Yosemite Water Co.,* 20 Cal. 4th 785 (1999). In that case, the California Supreme Court

4 explained that in order to determine whether an employee is "exempt" as an outside

5 salesman courts should (1) inquire into the realistic requirements of the job, (2) consider

6 how the employee "actually spends his or her time," and (3) consider whether the

7 employee's practices diverge from the employer's realistic expectations. *Id.* at 802. Rite

8 Aid argues that under this framework this Court would necessarily be required to

9 examine how each Store Manager "actually spends his or her time" in order to assess

10 whether she or he is improperly designated as an exempt employee. This type of

11 individualized inquiry, Rite Aid concludes, would clearly overwhelm, or at least

12 predominate over, any common issues in the case.

13        The California Supreme Court, however, squarely held, in *Sav-On Drug Stores v.*

14 *Superior Court,* 34 Cal. 4th 319, 336 (2004), that the analysis set forth in *Ramirez* does

15 not preclude class certification in cases such as this. *Id.* at 338 ("In sum, defendant's

16 reliance on *Ramirez* [to defeat class certification] is misplaced."). *Sav-On* also involved

17 a challenge to a drug store chain's blanket classification of its "Operating [Store]

18 Managers" and "Assistant Managers" as exempt, management employees. As in this

19 case, plaintiffs argued that Sav-On had so standardized store operations that the duties of

20 the managers were similar in critical respects from store to store. *Id.* at 325. Sav-On also

21 opposed certification on the same grounds advanced here – that individual issues would

22 predominate because determining its liability would "necessarily require[] making

23 individual computations of how much time each class member actually spent working on

24 specific tasks." *Id.* at 328. Sav-On also argued that each manager position was unique

25 because the activities they performed varied significantly from store to store based on

26 various factors such as store size, location, layout, staffing, and hours of operation. *Id.* at

27 325, 328 The trial court granted class certification and the appellate court reversed,

28 finding that common issues did not predominate.

15

United States District Court
For the Northern District of California

1    The California Supreme Court reversed the appellate court and held that the trial

2    court acted within its discretion in finding that common issues predominated and

3    certifying a class. The Court held that *Ramirez*, which was not a class action, does not

4    bar class actions involving challenges to employers who designate a category of

5    employees as exempt. *Id.* at 336-37. It acknowledged that disputes over how an

6    employee actually spends his or her time has the potential to generate individual issues.

7    "But considerations such as 'the employer's realistic expectations' . . . and 'the actual

8    overall requirements of the job' are likely to prove susceptible of common proof." *Id.* at

9    336-37. It also expressly rejected Sav-On's argument that "a variation in the mix of

10   actual work activities undertaken . . . by individual [managers] . . . bars class

11   certification as a matter of law." *Id.* at 335. As the *Sav-On* Court noted, this conclusion

12   is also consistent with the remedial purposes of California's overtime laws which are "to

13   be construed so as to promote employee protection." *Id.* at 340.

14   As noted above, determining whether common questions "predominate" requires

15   a pragmatic assessment of the entire case and the issues involved. Having considered all

16   of the above, and having weighed the evidence presented, the Court is satisfied that

17   Plaintiff has met his burden of demonstrating that common issues will predominate over

18   individual issues in this case. The evidence indicates that Rite Aid treats its Store

19   Managers as one homogenous group and that while some variations may exist, the Store

20   Manager position at Rite Aid is, in fact, sufficiently similar from store to store in all

21   important respects such that class treatment is appropriate in this case. Many

22   "significant aspects" of the case, *see Hanlon*, 150 F.3d at 1022, can be resolved on a

23   class basis including, *inter alia*,, the actual requirements of the job, the realistic

24   expectations of the employer, the proper classification of Store Manager tasks as exempt

25   or non-exempt, and Rite Aid's state of mind, knowledge, historical actions, and policies

26   with respect to its classification and treatment of Store Managers. The Court concludes

27   that these and other common issues will "predominate" over any individual issues that

28   may arise in this case. *See Sav-On*, 4 Cal. 4th 319 (upholding trial court finding that

United States District Court
For the Northern District of California

common questions predominated in store manager overtime case against chain store); *Wang v  Chinese Daily News, Inc.*, 231 F.R.D. at 614 (certifying overtime class and observing that "[c]ourts recognize that employer practices and policies with regard to wages and hours often have an impact on large numbers of workers in ways that are sufficiently similar to make class-based resolution appropriate and efficient."); *Romero,* 235 F.R.D. at 487 (certifying class of employees challenging exempt status and noting that the "Supreme Court of California has concluded [in *Sav-On,* 34 Cal. 4th 319] that, consistent with California overtime statutes, courts may couple uniform findings on common issues with 'innovative procedural tools' that can efficiently resolve individual questions."); *cf. Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512-13 (9th Cir. 1978) (upholding certification of overtime class action under Federal Labor Standards Act); *but see Sepulveda v. Wal-Mart Store, Inc.*, No. CV-04-1003 (C.D. Cal. May 5, 2006) (finding that common questions did not predominate in case involving store managers); *Dunbar v. Alberto's, Inc.*, 47 Cal. Rptr. 3rd 83 (2006) (finding that trial court did not abuse discretion in declining to certify overtime class of store managers).

### 2. Superiority of Class Action

In addition to demonstrating the predominance of common questions, Plaintiff must also demonstrate that resolution of the issues on a class-wide basis is superior to other available methods for the fair and efficient adjudication of the controversy. In making this assessment, the Court should consider (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions, (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (d) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3).

Rite Aid does not argue, and there is no indication, that class members seek to individually control their cases, that individual litigation is already pending in other

1  forums, or that this particular forum is undesirable for any reason. Defendants do argue,
2  however, that class resolution of the issues in this case would not be superior for the
3  following reasons.

4      First, Rite Aid argues that individual Store Managers will have sufficient
5  incentive to pursue claims individually because sufficient damages are at stake. The
6  amount of damages at issue, however, is uncertain at this juncture and undoubtedly
7  unclear to the average Store Manager, who may also, understandably, be reluctant to
8  pursue a claim individually against a current employer.

9      Second, Rite Aid contends that Store Managers have a preferable alternative
10  avenue for seeking relief because they can file an administrative complaint with the
11  California Labor Commissioner, which decision is subject to *de novo* review in the
12  Superior Court. Defendants fail to demonstrate why this approach, which potentially
13  involves administrative <u>and</u> judicial proceedings, would be preferable for class members,
14  and it cites no case in which a court has so found. On the contrary, courts have rejected
15  this argument, *see e.g. Wang*, 231 F.R.D. at 614.

16      Third, Rite Aid argues that class resolution would not be superior because of the
17  predominance of individual issues. The Court has concluded above, however, that
18  individual issues do not predominate.

19      Finally, Rite Aid argues that a class action would not be superior because the need
20  to address individual issues would render the case unmanageable. Specifically, Rite Aid
21  contends that the Court would be required to preside over 1,100 mini-trials in order to
22  determine how each class member spends his or her time, rendering a class action
23  unmanageable. *Sav-On* expressly rejects the notion, however, that an overtime class
24  action would necessarily "'degenerate into a multitude of mini-trials.'" *Sav-On*, 34 Cal.
25  4th at 332. Rather, as *Sav-On* observed, courts in overtime cases such as this  may
26  properly couple uniform findings on common issues regarding the proper classification
27  of the position at issue with innovative procedural tools that can efficiently resolve
28  individual questions regarding eligibility and damages. Such tools include

administrative mini-proceedings, special master hearings, and specially fashioned formulas or surveys. *See Sav-On*, 34 Cal. 4th at 332-35, 337 & n.12. *Romero*, 235 F.R.D. at 487. In short, the California Supreme Court has rejected the notion that an employer is necessarily entitled, under California law generally or *Ramirez* in particular, to an individualized trial with respect to each class member in an overtime case. *See Sav-On*, 34 Cal. 4th at 332-38. Rather, where, as here, there is sufficient similarity among Store Manager positions to render class treatment appropriate, any remaining individual issues regarding eligibility for relief or damages can be addressed through other measures.

If a class was not certified in this case, the alternative would be either numerous individual suits or the abandonment of individual claims. The former would undoubtedly result in a great duplication of effort given the predominance of common questions of law and fact, while the latter would result in lost access to the courts. Given this, and all of the other reasons discussed above, the Court concludes that "resolution of the issues on a class-wide basis is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

D. CONCLUSION

In light of all of the above, the Court finds that Plaintiff has satisfied his burden of demonstrating that the prerequisites of Fed. R. Civ. P. 23(a) have been satisfied and that this action may be maintained as a class action pursuant to Rule 23(b)(3). District courts, of course, have the inherent discretion to review class certification decisions at any time. *Armstrong v. Davis*, 275 F.3d 849, 872, n.28 (9th Cir. 2001). Accordingly, should future circumstances demonstrate that individual issues in this case either predominate or render the case less manageable than anticipated, the Court can always revisit its certification decision at that time.

Accordingly, and good cause appearing, it is HEREBY ORDERED that:

1) Plaintiff's Motion for Class Certification is GRANTED.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

2) Defendant's Objections to and Motion to Strike Plaintiff's Evidence Submitted in Support of Motion for Class Certification is denied as moot as the Court did not rely upon either of the two items to which Defendant objected.

3) The following class is certified with respect to Plaintiff's first through fourth claims for relief pursuant to Federal Rule 23(b)(3):

> All persons employed as Store Managers in any of Rite Aid Corporation's California retail drugstores at any time between May 9, 2001 and the present.

4) Plaintiff Prag Tierno is appointed as a class representative. Scott Edward Cole and the firm of Scott Cole & Associates are appointed as counsel for the plaintiff class.

5) The parties shall meet and confer in good faith as soon as practicable with respect to the requirements of Federal Rule of Civil Procedure 23(c)(2)(B) governing notice to the class. If, however, the parties are unable to informally resolve this matter by way of a stipulation and proposed order, Plaintiff shall bring a noticed motion.

6) The Court shall hold a case management conference on Monday, October 23, 2006 at 1:30 p.m. Case Management Conference statements shall be due 10 days in advance.

**IT IS SO ORDERED.**

Dated: August 31, 2006

THELTON E. HENDERSON
UNITED STATES DISTRICT
JUDGE

20

# APPENDIX B

Sample Rite Aid Self-Audit

## RITE AID STORE MANAGER WORK-TIME SELF-AUDIT

As you already know from your orientation, training, and evaluation, as well as previous reminders and self-audits such as this one, as a Rite Aid Store Manager you are the leader of the management team at the store and are expected to spend the majority of your work time on managerial duties. Although on occasion you are expected to help out with non-managerial duties as the need may arise in your store, if, on average, those non-managerial duties consume as much as 50 percent or more of your time, you are not performing the Store Manager job functions as expected.

Using this self-audit form, analyze and report how you spend your work time. As we made clear when we conducted this self-audit last year, it is essential that you be candid. If you are spending the majority of your time on non-managerial duties, we want to understand the conditions in your store causing this, and we will work with you to restore the proper balance of your work duties. Although completion of this self audit form is mandatory, no adverse action will be taken against you regardless of how you respond. Similarly, you will not receive any reward or benefit based on how you answer. All we want are your honest responses.

The chart on the next page contains a list of the job duties that a Rite Aid Store Manager may be called upon to perform in the course of a day. For the audit period specified on the chart, please report the percentage of your work time, during an average work week, that you spend performing each duty. For managerial job duties and non-managerial job duties each, add up your percentages; the totals from both categories must equal 100%. If the percentage of your time spent on non-managerial job duties is 50% or more, explain on the back of this form the circumstances at your store that have caused this imbalance and what steps you and we can take to restore the proper balance of your job duties.

If our efforts are unsuccessful at restoring the proper work balance, we may reconsider your exempt classification. We want to assure you, however, that if you were reclassified as non-exempt, all this would mean is that your compensation would be changed from salaried to hourly at a rate that, with anticipated overtime hours, would not be expected to result in a loss of pay. You would remain a Rite Aid Store Manager in all other respects.

When you have completed the form, please date and sign it certifying that the information is accurate. Please submit the completed form not later than _____, 2006.

Thank you in advance for your time.

# RITE AID STORE MANAGER WORK-TIME SELF-AUDIT

**Name:** _____

**Audit Period: April 2005-March 2006**

**Store:** _____

**DM:** _____

| Time Spent on Managerial Job Duties | Managerial |
|---|---|
| **Administrative duties**, including receiving, implementing and communicating corporate directives related to store operations, reviewing emails, providing for the safety of employees and store property, loss prevention, inventory control, and participating in management meetings | % |
| **Sales management**, including reviewing store sales volume and sales goals, planning strategy for sales and surveying and monitoring store competition | % |
| **Cash management**, including logging cashiers into the register, monitoring cash handling and managing payroll | % |
| **Staff supervision**, including walking the floor, planning and distributing work tasks, coaching, scheduling, overseeing display setup and merchandise pricing, and monitoring the sales floor | % |
| **Personnel administration**, including interviewing, hiring, training, performance reviews, discipline, and enforcing human resources policies | % |
| **Merchandise management**, including communicating with vendors, ordering merchandise, directing the merchandising of the floor, directing the set up of visual displays | % |
| **Other managerial tasks**, including (but not limited to) walking the floor | % |
| **Total Time Spent on Managerial Duties (A)** | % |
| **Time Spent on Non-Managerial Job Duties** | **Non Managerial** |
| **Assisting customers**, including answering customer questions and locating merchandise | % |
| **Ringing up sales** at the cashier's register | % |
| **Counting money** | % |
| **Unloading and stocking** delivered merchandise | % |
| **Pricing** merchandise | % |
| **Store & inventory maintenance**, including cleaning, re-shelving merchandise, physically moving merchandise and organizing the storeroom | % |
| **Setting up signage** and visual displays | % |
| **Other non-**managerial **tasks** | % |
| **Total Time Spent on Non-Managerial Duties (B)** | % |
| **Total for Managerial and Non-Managerial Job Duties (A+B) (must total 100% )** | % |

Dated: _____ .     _____

Signature

\*     If the percentage of your work time spent on non-managerial duties is 50% or more, explain on the back of this form why that is and what steps we can take together to restore the proper balance of your job duties.

During the review period of this self-audit, I spent 50% or more of my work time on non-managerial duties because:

_____

_____

_____

_____

_____

_____

_____

_____

To restore the proper balance of my job duties, Rite Aid and I together can take the following steps:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

# APPENDIX C

Samples of Charts of Rite Aid Self-Audits and Observational Study
Made Part of the Record Before the District Court

Exhibit B-1: LECG Observational Study
Percent of Time Spent on All Managerial Tasks



Each Bar Represents an Observed Store Manager

Exhibit B-2: LECG Observational Study
Percent Breakdown by Work Category



Each Bar Represents an Observed Store Manager

Legend:
- Perform Store Functions
- Manual Task
- Manage Store Functions
- Manage Employees
- Customer Escalation
- Customer Assistance
- Corporate Function

Exhibit C-1: Rite Aid February 2005 Self-Audits
Percent of Time Spent on All Managerial Duties

Each Dot Represents a Reporting Store Manager

Exhibit D-1: Rite Aid June 2006 Self-Audits
Percent of Time Spent on All Managerial Duties



Each Dot Represents a Reporting Store Manager

100%   90%   80%   70%   60%   50%   40%   30%   20%

## DECLARATION OF SERVICE

I am a citizen of the United States, more than eighteen years old, not a party to this action. I am employed by Paul, Hastings, Janofsky & Walker LLP, attorneys of record for defendant/appellant Rite Aid Corporation, and my place of employment and business address is 55 Second Street, 24th Floor, San Francisco, California 94105-3441.

I am readily familiar with my firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. At the direction of a member of the Bar of this Court who represents defendant/appellant Rite Aid Corporation, on September 14, 2006, I placed with my firm at the above address for deposit with the United States Postal Service true and correct copies of **PETITION FOR PERMISSION TO APPEAL FROM ORDER GRANTING CLASS CERTIFICATION** in envelopes, postage fully paid, addressed as follows:

Scott Edward Cole                    Clerk of the Court
Matthew R. Bainer                    United States District Court
Scott Cole & Associates, Inc.        for the Northern District of California
1970 Broadway, Suite 950             450 Golden Gate Avenue
Oakland, CA 94612                     San Francisco, CA 94102

Following ordinary business practices, the envelopes were sealed and placed for collection and mailing on this date, and would, in the ordinary course of business, be deposited with the United States Postal Service on this date.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 14, 2006, at San Francisco, California.

_Meredith Mitchell_
Meredith Mitchell